**BECKET v. COE, Commissioner of Patents.**

**No. 6790.**

United States Court of Appeals for the District of Columbia.

Decided Sept. 27, 1937.

On Rehearing June 6, 1938.

Ralph E. Parker and Richard L. Scheffler, both of Washington, D. C., and Warren J. Willis, Eugene L. Greenewald, and Donald C. Harrison, all of New York City, for appellant.

R. F. Whitehead, Solicitor, U. S. Patent Office, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

PER CURIAM.

The decree of the District Court of the United States for the District of Columbia in this cause is affirmed by an equally divided court.

Mr. Justice VAN ORSDEL sat during the argument of this case but died August 7, 1937.

On Rehearing.

Before GRONER, Chief Justice, and STEPHENS and MILLER, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from a decree of the District Court of the United States for the District of Columbia, which dismissed a bill brought under Revised Statutes, Section 4915, 35 U.S.C. § 63, 35 U.S.C.A. § 63, seek-

ing a decree directing the Commissioner of Patents to allow certain claims of an application for letters patent.

Becket, the appellant, filed an application in the Patent Office, setting forth claims for a stain-resisting iron-base alloy having deep-drawing properties. The Examiner rejected claims 9, 10 and 11 on the ground that they showed no invention over the references: Greaves (British) 117,286; Hadfield (British) 313,471; Hadfield (French) 590,691; Commentry (French) 666,789. The Board of Appeals affirmed the Examiner's rejection, relying solely upon Commentry (French) and Hadfield (French). The appellant thereupon brought his original bill in this suit. Thereafter the Patent Office granted Patent No. 1,962,702 to Percy A. E. Armstrong for a corrosion-resistant ferrous alloy. The appellant, apparently claiming that Armstrong's alloy and his were substantially the same, copied Armstrong's claim 6 and added it to his application as claim 12. The Examiner rejected this claim upon the ground that it was not warranted by the original disclosure, and his decision was affirmed by the Board of Appeals. The appellant thereupon filed a supplemental bill of complaint in the District Court, adding his claim 12 to his action. The court dismissed the bill as to claims 9-12, inclusive.

The appellant's original claims involved herein are as follows:

"9. A stain-resisting iron-base alloy having deep-drawing properties and comprising from about 16% to about 22% of chromium; about 0.25% to about 2.75% of copper; carbon, the carbon content being not more than about 0.3%; at least about 3% of manganese and at least about 2% of nickel, the sum of the manganese and nickel percentages falling between about 6% and about 14%; the balance of the alloy being substantially iron.

"10. A stain-resisting iron-base alloy having deep-drawing properties and comprising from about 16% to about 22% of chromium; about 0.25% to about 2.5% of copper; carbon, the carbon content being not more than about 0.12%; at least about 3% of manganese and at least about 2% of nickel, the sum of the manganese and nickel percentages falling between about 8% and about 14%; the balance of the alloy being substantially iron.

"11. A stain-resisting iron-base alloy having deep-drawing properties and comprising from about 16% to about 22% of chromium; about 0.25% to about 2.5% copper; carbon, the carbon content being not more than about 0.12%; at least about 5.3% of manganese and at least about 2% of nickel, the sum of the manganese and nickel percentages falling between about 8% and about 14%; the balance of the alloy being substantially iron."

The specification showed the composition of several examples which the appellant had worked out within the claimed ranges of proportions. Such of the examples as contained copper showed a chromium content varying between 17.75% and 22.17%, copper content varying between 1.02% and 1.39%, carbon content between .07% and .24%, manganese content between 5.3% and 6.54%, and nickel content between 2.22% and 5.75%. Another specific example, containing copper but outside the range for chromium, had 12.54% chromium, .64% copper, .12% carbon, 6.12% manganese, and 6.29% nickel.

The Hadfield (French) patent claimed primarily a corrosion resistant alloy which had properties of resistance to oxidization and sealing at high temperatures and of high tensile and compression strength at both ordinary and high temperatures. The specification stated:

"For this purpose, an alloy according to the invention contains, in addition to iron, carbon up to about 1%, manganese up to about 8%, and from about 5% to about 25% of chromium, from about 5% to about 20% of nickel and from about 1% to about 10% of silicon *with, it may be, either from 1% to 10% of tungsten (or of its equivalent molybdenum), or up to about 6% of copper, or both of these elements together.*" [Italics added]

The ranges of elements in the first claim were carbon up to about 1%, manganese up to about 8%, chromium from 5% to 25%, nickel from about 5% to about 20%, and silicon from about .5% to about 10%. After stating these percentages the claim continued: ". . . these alloys being able also to contain either from about 1% to about 10% of tungsten (or its equivalent molybdenum), or up to about 6% of copper, or both of these elements at one time." The second claim varied these proportions by limiting silicon to .5% to 2% and nickel to 6% to 8%. Five alloys with specific stated proportions are also claimed in the patent. Of these four contain less than 1% of manganese. The only one of the specific

alloys which contains copper also contains 4.76% of tungsten, and 1.31% of silicon.

The Commentry[1] (French) patent claimed a corrosive resistant alloy composed of 15% to 30% chromium, 2% to 12% nickel, 12% to 2% manganese, and 1% carbon, the sum of the percentages of nickel and manganese being between 8% and 20%. The inclusion of copper was stated in the specification in the following language:

"The resistance of these alloys to certain corrosives can be improved by additions of Cu and Mo together or separately, a content of 6% of each of these elements being, in general, sufficient; their nonoxidizability at a red heat, an equally interesting property, by an addition of Si, of which a content up to 3% will generally suffice."

And in the résumé [claims] it was said:

"This invention comprises:

\*　　　\*　　　\*

"2. The addition to the alloy specified in [claim] (1) of the following elements, either in, combination or separately:

a) of copper and of molybdenum, together or separately, each of these elements having a content going for example up to 6%.

b) of silicon of which the content may go for example up to 3%.

c) of known purging agents, such as aluminum, vanadium, titanium, zirconium.

"3. A variant of the alloy specified in 1 and 2, in which the nickel is totally or partially replaced by cobalt."

Commentry gave no example of a specific alloy containing copper. He did, however, say that his alloy could be worked into tubes and wire-drawn filaments.

It will at once be seen that the specifications set forth in the appellant's claims 9, 10 and 11 fall within the ranges in the Hadfield (French) and Commentry (French) patents.

We think, however, that the Hadfield (French) patent does not anticipate the Becket application. The properties which Hadfield particularly asserted were increased resistance to oxidization and scaling, resistance to flame and hot products of combustion, and great mechanical strength at high temperatures. Nothing in the patent indicates that he was aware that alloys made within the ranges which he claimed would be stainless and deep-drawing. It is true that he describes his alloy as resistant to corrosion by air, water, and acids, but general corrosion resistance seems to be a quality not equivalent to stainlessness. For example, nickel resists many types of corrosion but tarnishes easily. Furthermore, the Hadfield (French) patent does not disclose a comprehension that copper was an essential element of the alloy. It will be noted that Hadfield said that copper could be included up to 6% in combination with from 1% to 10% of tungsten or molybdenum, or separately; but although he spoke of the use of copper separately, the only example containing copper also contained a substantial percentage of tungsten. Thus, although he mentions a chromium-manganese-nickel-copper ferrous alloy, he gives no example of such an alloy, nor does he reveal that he ever actually made an alloy which contained copper in the absence of tungsten. And the specific examples show further that Hadfield was directing his attention primarily to a low-manganese alloy.[2] Silicon was evidently regarded as an essential part of the alloy. The Patent Office thought this immaterial, since all steel contains some silicon, and Becket had named the bulk of his alloy as "substantially all iron." The so-called "residual silicon" present in practically all steel, however, is smaller in amount than the proportion Hadfield mentions. Steel containing over .5% silicon is considered an alloy, rather than common steel. Camp and Francis, *op. cit. supra n. 2*, 758-59. The minimum of Hadfield's inclusion of silicon is .5%, the maximum 10%. We think it clear that Hadfield patented a chromium-

[1] This patent was granted to a company, but for convenience we refer to it as if granted to an individual.

[2] The variance in the proportion of manganese in Becket's examples and those of Hadfield, and the latter's inclusion of tungsten, are the more significant because Hadfield is noted for his prior researches in the effects of manganese and tungsten upon steel. In a paper read before the British Iron & Steel Institute in 1888 he showed for the first time the utility of high manganese steels. In 1902-03 he exhaustively investigated the effects of tungsten alone upon steel, and these researches were reported in Hadfield, *Alloys of Iron and Tungsten* (1903) 11 Journal of the Iron and Steel Institute [British]. See Camp and Francis, The Making, Shaping and Treating of Steel (4th ed. 1925).

manganese-nickel-silicon alloy, and that he made a chromium-manganese-nickel-silicon-copper-tungsten alloy. His mere mention of a chromium-manganese-nickel-copper alloy is not an anticipation of Becket. He was claiming a different sort of corrosion-resistant alloy, and merely added that his basic formula was "able to contain some copper." This was no more than a claim of the unexplored. It was common knowledge that even small amounts of copper aided steel's resistance to corrosion, and Hadfield indicated no more than this.

The Commentry (French) patent has more force as a reference than has the Hadfield (French), since the former has some indication that the alloys described can be deep-drawn and there is a statement as to the sum of the percentages of nickel and manganese, just as there is in the Becket application. A careful reading of the patent, however, convinces us that so far as a chromium-manganese-nickel-copper ferrous alloy is concerned the inventor was but guessing in the dark. This type alloy is mentioned only as a variant of a chromium-nickel-manganese alloy, with neither details as to what different results would be obtained, nor any indication that the metal would resist staining. He gives no illustration of the use of an alloy containing copper and merely suggests that it may be added to increase resistance to "certain corrosives." It seems clear that one seeking to find an alloy both stainless and deep-drawing would be led by the Commentry patent, if at all, into lengthy experimentation. Commentry suggested the addition of copper, but he also suggested adding molybdenum, silicon, cobalt, aluminum, vanadium, titanium and zirconium. A patent suggesting such a list of possible combining elements was held not an anticipation of a specific use of two of them in Haynes Stellite Co. v. Chesterfield, 6 Cir., 1927, 22 F. 2d 635.

■ Foreign patents are valid references when there is a clear disclosure of the invention sought to be patented in the United States. In re Cross, Cust. & Pat. App., 1932, 62 F.2d 182. But when such a patent merely prophesies what can be done without setting forth that it has been done, or makes claims for things not fairly disclosed in the specification, the foreign patent does not anticipate. Westinghouse Air-Brake Co. v. Great Northern Ry. Co., 2 Cir., 1898, 88 F. 258; General Electric Co. v. Hoskins Mfg. Co., 7 Cir., 1915, 224 F.

464; Haynes Stellite Co. v. Chesterfield, supra; American Stainless Steel Co. v. Ludlum Steel Co., 2 Cir., 1923, 290 F. 103. This court has said, in Davies v. Coe, 1936, 65 App.D.C. 345, 346, 83 F.2d 602, 603:

"The disclosure of a foreign patent is to be measured not by what may be made out of it, but what is clearly and definitely expressed in it. In re Ek, 57 App.D.C. 203, 19 F.(2d) 677; Carson v. American Smelting & Refining Co. [C.C.A.] 4 F.(2d) 463."

And in the Westinghouse Case the court held valid a United States patent for an air-brake, despite a prior English patent which stated: "It is obvious that it [the stem of the emergency valve] might be worked as described by a separate piston in a cylindrical cavity communicating on the one side with the auxiliary reservoir, and on the other side with the train pipe." In answering the contention that this described the valve set forth in the United States patent, and that therefore the latter lacked invention, the court said:

"The prophetical suggestions in English patents of what can be done, when no one has ever tested by actual and hard experience and under the stress of competition the truth of these suggestions, or the practical difficulties in the way of their accomplishment, or even whether the suggestions are feasible, do not carry conviction of the truth of these frequent and vague statements. The nature and character of the invention of 376,837 were, in the record heretofore before this court, put to rigorous tests by examination and cross-examination in court; and the result which was then reached is not shaken by merely a single sentence in the English patent." [88 F. at page 263]

Much the same thought is expressed in American Stainless Steel Co. v. Ludlum Steel Co., supra:

". . . it requires more than prophecy of what may be done, or than declaration of what ought to be accomplished, to make a good patent reference, not to speak of an anticipation. It is necessary to show with reasonable certainty how the desired result can be accomplished." [290 F. at page 106]

■ We do not question that Hadfield and Commentry invented new and useful alloys, or that they state ranges which include the Becket discoveries. We think it was still possible, however, for an inventor to investigate subsequently and to find for

the first time a chromium-manganese-nickel-copper ferrous alloy which was both stainless and deep-drawing. Though it be true that the alloy was found within ranges already known, it was an alloy of which both Hadfield and Commentry were unaware. With the Becket application before us it is possible to look back upon the Hadfield (French) and Commentry (French) patents and to say that they suggested what he found, but such hindsight should not, we think, defeat his application. Hadfield and Commentry seem neither to have sought nor to have found an alloy which is both stainless and deep-drawing, and though it be true that the scope of their ranges embraces the claims of Becket, this speaks of the extent of their desire rather than of the breadth of their discoveries. In short, within previously claimed ranges Becket has found more restricted ones which produce a different alloy from that known to the prior inventors. One seeking a stainless deep-drawing alloy and finding the Hadfield (French) and Commentry (French) patents could not have said: "These give me what I want."[3] In the light of the decisions above cited as to the effect of foreign patents as anticipations, neither of the foreign references anticipated Becket.

■ Patentability of an alloy upon the basis of new proportions of old elements requires that the new proportions give a new result; either a new alloy, or an old alloy with new characteristics which result in entirely new, or substantially enhanced, qualities of utility. Bethlehem Steel Co. v. Churchward International Steel Co., 3 Cir., 1920, 268 F. 361; Darwin & Milner, Inc., v. Kinite Corporation, 7 Cir., 1934, 72 F.2d 437; Pittsburgh Iron & Steel Foundries Co. v. Seaman-Sleeth Co., 3 Cir., 1918, 248 F. 705; Ex parte Cramp-

ton, 1934, 21 U.S.Pat.Q. 644. We think that the Becket alloys met this test. There is undisputed evidence in the record that prior to the Becket alloys the only commercially available stainless steel which could be deep-drawn was the so-called "18-8" (18% chromium and 8% nickel). Becket's steel is stainless and can be deep-drawn, and has novel proportions. It may fairly be said, therefore, that he has produced a new alloy with highly desirable qualities.

There is evidence that the proportions named by Becket are critical; in other words, that substantial departure from his proportions will result in failure to achieve the alloy of his invention. The Patent Office does not dispute the utility of the alloy and, as stated above, we are of the opinion that the Hadfield (French) and Commentry (French) patents do not anticipate Becket. The decision of the trial court is, therefore, reversed as to claims 9, 10 and 11.

■ We think that the decree of the trial court in rejecting claim 12 should be affirmed. This claim had been copied verbatim from the Armstrong patent, and was for

"A ferrous alloy characterized by its resistance to acid corrosion or intergranular corrosion, by its machineability and forgeability and its stable nonmagnetic condition comprising chromium about 18%, nickel about 8%, copper about 1.5% to 3%, manganese about 4% to 6%, carbon not substantially above about 0.15% and silicon less than 1%, the balance being substantially all iron."

These specific proportions fall within the ranges which Becket had claimed, save in the case of copper, wherein his maximum was 2.75%, rather than the 3% of claim 12. Nothing in Becket's specification dealt with the subject of intergranular corrosion,

---

[3] This is the test laid down in Skelly Oil Co. v. Universal Oil Products Co., 3 Cir., 1929, 31 F.2d 427, 431, where it is said:

" . . . Inferences as distinguished from disclosures, especially when drawn in the light of after events, cannot be accepted as a basis of anticipation.

"A patent relied upon as an anticipation must itself speak. Its specification must give in substance the same knowledge and the same directions as the specification of the patent in suit. Otto v. Linford, 46 L. T. (N. S.) 35, 44. It is not enough to prove that a method or apparatus described in an earlier specification can be made to produce this or that result. Flour Oxidizing Co. v. Carr & Co., 35 R.P.C. 457. A singularly sensible test of the rule of anticipation is given in British Thomson-Houston Co. v. Metropolitan Vickers Electrical Co., 45 R.P.C. 22, by asking the question—'Would a man who was grappling with the problem solved by the patent attacked, and having no knowledge of that patent, if he had had the alleged anticipation in his hand, have said: 'That gives me what I wish?' " The Pope Alliance Corporation v. Spanish River Pulp & Paper Mills, Ltd. (Privy Council Appeals No. 33 of 1928.)"

and the claim therefore asserts an attribute for the metal which the specification does not support. Further, neither in specification nor in proof has anything been advanced as to these particular proportions. We think the invention is sufficiently protected by claims 9, 10 and 11.

Reversed in part; affirmed in part.