**BALDWIN–SOUTHWARK CORPORATION**
et al. v. COE, Com'r of Internal
Revenue.

No. 7821.

United States Court of Appeals for the
District of Columbia.

Decided Nov. 30, 1942.

Mr. Clifton V. Edwards, of New York
City, with whom Messrs. John B. Brady,
of Washington, D. C., and E. A. Hathaway,
of Philadelphia, Pa., were on the brief, for
appellants.

Mr. W. W. Cochran, Solicitor, United
States Patent Office, of Washington, D. C.,
for appellee.

Before STEPHENS, VINSON, and
RUTLEDGE, Associate Justices.

STEPHENS, Associate Justice:

This is an appeal from a judgment of the
District Court of the United States for the
District of Columbia dismissing a suit
brought under Rev.Stat. § 4915 (1875), 35
U.S.C.A. § 63, by the Baldwin-Southwark
Corporation and Robert F. Blanks, appel-
lants, for an order authorizing the Commis-
sioner of Patents, appellee, to issue a
patent on claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 19,
20, 22 and 23 of an application for a
patent filed by Blanks on October 11, 1932,
and assigned by him to the Baldwin-South-
wark Corporation on October 26, 1932.

The Blanks application discloses a ma-
terials testing machine so constructed that
a test load may be applied to a material
specimen at a predetermined rate of load
change. The apparatus is described in
terms of its use with an hydraulic testing
machine, although Blanks states that it
can be used also with a mechanical testing
machine. Claims 1, 6 and 23, which are
representative, read as follows:

1. An apparatus for determining a predeter-
mined rate of load change applied to a test
specimen in a materials testing machine com-
prising, in combination, a plurality of indicat-
ing members adapted to have similar paths of
movement in relatively close relation for pur-
poses of common visible comparison, means for
driving one of said indicating members at a
predetermined rate of speed, and means where-
by the other member is adapted to be driven
in response to the test load, whereby the rela-
tive positions of said members may be used
to determine the rate applying load to the
specimen.

6. An apparatus for determining a predeter-
mined rate of load change applied to a test
specimen in a materials testing machine com-
prising, in combination, a stress indicating
hand, an auxiliary hand, means rotatably sup-
porting said hands in superimposed axial rela-
tion, means for driving one of said indicating

members at a predetermined rate of speed, and means whereby the other member is adapted to be driven in response to the test load, whereby the relative positions of said members may be used to determine the rate of applying load to the specimen.

23. The combination in an apparatus for effecting a predetermined rate of load change applied to a test specimen in a materials testing machine having opposed specimen-engaging elements one of which is moved to apply load to the specimen; comprising, a rate of load member movable at the precise predetermined rate of speed at which it is desired to apply load progressively to a specimen at each instant during a test irrespective of deformation characteristics of the specimen, means for continuously driving said member at said speed, a load indicating member movable in accordance with the actual load applied to the specimen and movable adjacent to said rate of load member in visible register therewith so long as load is actually applied to the specimen at said predetermined rate, means for actuating said load indicating member solely in accordance with the load force applied to the specimen, and adjustable means for controlling the application of load to the movable specimen engaging element of the testing machine whereby the operator may control the application of load force to the specimen and simultaneously observe whether said register relation is being maintained.

Blanks' apparatus and the operation thereof can best be understood in terms of the following drawings selected from his application:

FIGURE 1

Figure 1 is a diagrammatic view of an hydraulic testing machine in which a test specimen has been placed. The specimen 1 is shown placed between the two opposed cross-heads 2e and 2d. One of these is moved by hydraulic pressure supplied from pressure pump 2a to a main loading cylinder 2b, which contains a piston or ram. A manually operable valve 2g is disposed in the pipe which carries the fluid from the pressure pump 2a to the main loading cylinder 2b. By this valve the load applied to the specimen is controlled. Figure 2 shows the front elevation of the combina-

FIGURE 2

tion of members which comprise the apparatus, to be used in connection with the testing machine, for which Blanks claims a right to patent. The relation of this apparatus to the testing machine itself can be seen in Figure 1 just above the control valve 2g. In Figure 2 hand 3—the stress indicating hand of the claims—moves clockwise across the graduations of the dial in response to the load applied, through the manually operable valve 2g, to the specimen 1 by the testing machine. The movement of this hand thus affords, in connection with the graduations on the dial, a visual indication of the load applied or being applied to the specimen. The hand marked 13—the auxiliary or rate of load hand of the claims, hereafter referred to for convenience as the pacer hand—is, by means independent of that which carries the stress indicating hand 3, carried in superimposed and visual relation with the

latter, and is capable of being caused, by means of an adjustable driving mechanism, to cross in clockwise direction each of the graduations on the dial at a predetermined rate of speed commensurable with the rate of change at which each unit of a load, represented by the graduations on the dial, is desired to be applied to the specimen. The upper part of Figure 3 shows a vertical

### Figure 3

cross-section of the apparatus which is seen in front elevation in Figure 2. It discloses that the two hands, 13 and 3, although separately carried, are set upon the same axis.

In using an hydraulic testing machine equipped with the Blanks apparatus the pacer hand 13 is so regulated, by means of a watt hour meter shown as 19 in the lower part of Figure 3, that it will cross the load indicating graduations of the dial at a rate of speed commensurable with the desired rate of load change. Through manual operation of valve 2g, hand 3, the load registering hand, is caused to move across the graduations of the dial in register, i.e., coincidentally, with pacer hand 13, with the result that the load is applied to the specimen at the desired predetermined rate of change. For example, if it is desired to apply a 20,000 pound load in five minutes, pacer hand 13 is set so that it will cover the first two graduations on the dial in that period of time, and then load hand 3 is caused, by application of the load through manually operable valve 2g, to keep pace with hand 13, so that when both have reached the 20,000 mark in five minutes time the load will have been applied to the full extent of 20,000 pounds during that time. Also the pacer hand may be set so as to reflect predetermined variations in the time within which a given load will be applied, and the load hand, through manual operation of valve 2g, caused to keep pace with the pacer hand in these variations.

The Commissioner contends and the trial court found that Blanks' apparatus is not inventive in view of the disclosures of a trade circular alleged to have been published and distributed in Europe by Ernst Krause & Company of Vienna, Austria, more than two years prior to the date of Blanks' application. The Commissioner's contention is predicated upon Rev.Stat. § 4886 (1875), 35 U.S.C.A. § 31 (1934), which, as it stood amended at that date, is set out in the margin,[1] and upon conclu-

---

[1] "Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvements thereof, or who has invented or discovered and asexually reproduced any distinct and new variety of plant, other than a tuber-propagated plant, not known or used by others in this country, before his invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, or more than two years prior to his application, and not in public use or on sale in this country for more than two years prior to his application, unless the same is proved to have been abandoned, may, upon payment of the fees required by law, and other proceeding had, obtain a patent

sions which the Commissioner asserts plainly follow from examination of Illustration·1 of the Krause circular in the light of certain passages of the text thereof. The illustration and text passages [2] upon which the Commissioner relies are set out below:

### ERNST KRAUSE & CO. A.-G.

Vienna XX/2 Berlin W 8
Engerthstrasse 151 Franzosischestrasse 13-14
Budapest, Prague Cologne, Warsaw

Factory: Donauwerk, Brunewerk

*Hydraulic Universal-Material Testing Machine —Model MP 4*

For Tension, Compression, Buckling, Bending, Folding, Shearing, Punching and Brinell Tests, Chain and Spring Tests, Creep Tests, etc.

Maximum Loading—40,000 Kg.
Packing Free, Ground Piston, Shock Absorber
Load Indication by Pendulum Scale
Testing Speed Adjustable, in accordance with regulations of the German Railroad.

(Illustration 1. Normal Execution with Electric Drive and Storage Battery)

*Outstanding Features*
No foundation required; small set-up space required; easy to transport; no appearance of free forces; simple operation by handpump; electric motor and storage battery; clear vision of load tests by pendulum scale with three (3) test ranges; only one operator required; high efficiency (40 tons—88,184 lbs.); great versatility; finest regulation of testing speed.

*Our Hydraulic Universal-Material and Tensile Testing Machine Model MP 4*

is according to the principle of the hydraulic press constructed with a packing free piston. The load definition is established through pendulum scales. The machine has a capacity for tension and compression tests as high as 40,000 Kg. (88,184 lbs.) and consists essentially of a pump, a press cylinder; a pendulum scale for <u>direct</u> reading of loading and power transmitting mechanism.

The *press cylinder* is made of high grade, especially fine grain cast steel.

*Press piston and cylinder have a ground finish. The pistons travel freely with only an oil film between piston and cylinder wall, thus producing only liquid friction.* This friction value is, at all pressures, constant and disappearingly small, and is already balanced when engine is gauged at our Works.

The *pump body* is made of solid steel. As a pressure liquid, a good resin and acid-free mineral oil is used.

*Power reading:* A pendulum scale is used for reading of expended power. This pendulum scale has three (3) test ranged [sic] of 1 [sic] to 4,000 Kg. (8,818.4 lbs.); 0 to 12,000 Kg. (2,645.5 lbs.) and 0 to 40,000 Kg. (88,184 lbs.) The pendulum scale is not subjected to any wear and contains no parts endangered to overstrain, thus insuring correct power reading after longest time of operation.

For measuring of a desired testing speed (in accordance with acceptance regulations of the German Railroad), a time clock is used which is built into the pendulum scale. The hand of the clock is arranged concentric with the hands of the scale.

The contention of the Commissioner presents three questions: (1) Is the Krause circular a "printed publication" within the meaning of Rev.Stat. § 4886 (1875), 35 U.S.C.A. § 31 (1934); (2) Was it sufficiently proved that the circular had been published over two years prior to the date of Blanks' application; (3) Do the disclosures of the circular negative invention in Blanks' apparatus. The Commissioner urges that the answer to each of these questions is in the affirmative. It is to be noted, however, that if the answer to the third question is in the negative, the other two questions become immaterial. Moreover, the Commissioner conceded at the trial that the Krause circular is the only reference upon which the Patent Office relies to defeat invention and that if the circular does not disclose Blanks' apparatus the latter is inventive. The Commissioner also conceded utility. We set out in the margin the colloquy between counsel for

---

therefor. (R.S. § 4886; Mar. 3, 1897, c. 391, § 1, 29 Stat. 692; May 23, 1930, c. 312, § 1, 46 Stat. 376.)"

[2] The text of the circular was of course in the foreign vernacular. A translation

offered in evidence by the appellant at the trial in the District Court was received without objection and no question as to its correctness is raised in the case.

the Commissioner and for the appellant in which the concessions were made.[3]

The argument of the Commissioner in support of the contention that the Krause circular shows Blanks' apparatus is cast in the following terms:

...It will be evident from the illustration Figure 1 [of Krause] and the description, that the machine is for making tests of specimens under tension, compression, bending, etc. It is stated that the machine provides for the finest regulation of the testing speed and provides clear visibility of the tests on a pendulum manometer. This latter is the large gauge shown in about the center of Figure 1. It is stated ... that the gauge gives a direct reading of the loading on the specimen. The equivalent statement is also made that the gauge gives a reading of the exerted power....

The description of the Krause machine goes on to say:

For measuring of a desired testing speed (in accordance with acceptance regulations of the German Railroad), a time clock is used which is built into the pendulum scale. The hand of the clock is arranged concentric with the hands of the scale.

It is submitted to be obvious from this statement and from the previous description that one of the pointers shown on the gauge indicates the load and the other pointer is a clock hand for measuring the speed of testing....

* * *

The plurality of indicating numbers [members] recited in the claim [claim 1 of Blanks] are the two pointers shown on the Krause gauge. They obviously have similar paths of movement, both being pivoted for movement about a common axis, and are in relatively close relation for visible comparison. One of them is described in the Krause circular as a clock hand—i. e., a hand moving at a predetermined rate of speed. The other is described as showing the load applied to the specimen. The claim is thus clearly met.

It is also clear that the pointers of the Krause machine are in superimposed relation ...; that they are so supported that they may move in alinement with each other...; and that they rotate about a common axis....

Testing the strength of materials to bear the strains to which they will be subjected in actual use in structures is of the utmost importance in the field of engineering. The safety and durability of, for example, buildings, bridges and highways, can be assured only by ascertaining in advance the strength of the materials of which they are to be made. It is elementary that in the testing of materials it is of great importance to conduct the tests in terms of the time within which a load is applied. This was stated as early as 1887 in the Encyclopaedia Britannica (9th ed. 1887), Vol. XXII, as follows:

The ultimate strength for any one mode of stress, such as simple pull, has been found to depend on the time rate at which stress is applied; this will be noticed more fully later (§§ 28-34). ... [p. 596]

28. In testing a plastic material such as wrought-iron or mild steel it is found that the behaviour of the metal depends very materially on the time rate at which stress is applied. ... [p. 598]

For a long time prior to Blanks' application—fifty years or more—the engineering art had attempted to devise machines for the testing of both light and heavy materials whereby the time rate at which a load is applied could be accurately pre-

[3] The Court [Bailey, J.]: What is the purpose of this testimony? Does the Patent Office raise any question as to the utility of this apparatus?

Mr. Hathaway [counsel for the appellants]: It answers the question whether invention is involved. If a problem has been known for more than fifty years, as this article shows, and has been struggled with by men engaged in this work, and this applicant has found a solution of that problem, we think it is very important.

Mr. Cochran [counsel for the Commissioner]: I do not think the Patent Office questions that it is important in the testing of materials that the load be applied at a uniform and proper rate. There is no question about that.

The Court: If there is no question about that, we are only wasting time.

Mr. Cochran: The only question is: does the Krause publication show it and was that published. I think that is the real question.

The Court: I do not want to take so much time in connection with what it seems to me is not important in the decision of this case.

Mr. Edwards [counsel for the appellants]: I think we want to get in evidence at least enough to show that the problem has existed for a long time and has not been met. That is as far as I want to go—and that this invention does solve it.

Mr. Cochran: We are agreed that it does solve it.

The Court: I do not think there is any question in the Patent Office that it does not solve it.

Mr. Edwards: Then the only thing we want to show is that the problem has existed for a long time and that during that time it has not been solved, and that others have attempted to solve it.

The Court: I do not understand that the Patent Office claims any anticipation other than this Krause leaflet.

determined. The efforts of the art had developed two types of materials testing machines. In one the application of the load to the specimen at a predetermined time rate was, theoretically, directly measured. Machines of this type were the Olsen New Automatic Shot Cement Testing Machine and the Olsen Improved Constantly Applied Strain Cement Testing Machine. In the Shot Cement Testing Machine the load was applied to the specimen by means of a counter-balancing lever system. At one end of the lever was hung a weight equaling the total load to be applied; at the other was hung a receptacle filled with buckshot, also equaling in weight the total load. The buckshot were allowed to run out of the container at a uniform rate of speed governed by the size of the aperture through which they dropped. This machine was usable, however, only for small loads and material specimens and it did not operate with accuracy. In the Applied Strain Cement Testing Machine a jockey weight was, by means of an electric motor, run out a graduated scale at a predetermined time rate. Simultaneously through a hand operated control wheel an operator attempted to apply the load uniformly by keeping a floating beam in horizontal balance. This machine, again, was not practical for large loads or specimens, and was not fully effective even for small ones because of the difficulty of keeping the float balanced. If it was not kept in balance its oscillation produced inertia effects and increased load. One attempt of the prior art to predetermine the rate of application of load to specimen was by the use of an ordinary musical metronome in connection with an hydraulic machine of the first type which permitted application of the load in a manually controllable manner. The operator tried to apply the load, through the manual control, uniformly over a predetermined period of time beaten out by the metronome. If, for example, the operator desired to apply a load of 1,000 pounds in four seconds time, he would set the metronome to beat once each second and would try manually to control the application of the load so that at the first tick 250 pounds would have been applied, at the second 500 pounds, at the third 750 pounds, and at the fourth 1,000 pounds. This was unsuccessful because it required a nicer coordination of eye, ear and hand than was possible.[4]

In the second type of machine the application of the load to the specimen at a predetermined time rate was indirectly measured. The immediate object of the machine was to accomplish a predetermined control of the rate of progress of a force applying member or cross-head (as distinguished from the rate of increase of the load itself as in the first type of machine); that is to say, the force applying member was caused to move a given number of inches per unit of time. In connection with this there was a device for measuring the weight of the load. As the force applying member advanced and applied the load to the specimen it deformed the same either by compression or extension. What such a machine directly measured was the physical extent, in a predetermined period, of the deformation of the specimen rather than the time rate of load application. Moreover, deformation of screws and of the machine frame and slipping of the specimen in the grips between which it was held and elastic deformation of the specimen itself made such a machine only theoretically accurate in the uniform speed of advance of the force applying member; actually there was variation therein and consequent variation in time of the application of the load. Such a machine was the T. Olsen Recording Testing Machine disclosed in patent No. 445,476. This was a mechanical screw type machine. Another machine of this type was the Amsler Hydraulic Pendulum Type Testing Machine described by R. G. Batson and J. H. Hyde in their treatise "Mechanical Testing" (1922). Because of its importance in the discussion of this case we print below a

---

4 As one of the witnesses in the case (A. H. Emery) said: "The trouble is that you have got to coordinate your ear and eye to see what you are doing. If you are short on the first tick, you have got to speed up the machine a little bit by the control valves, hoping you do not overshoot on the second tick, and then slow it down again, so that it is a continuous correction and not a continuous indication that you are doing what you want to do. * * * It is not very easy to coordinate with your eye and ear and hand. You have got to make mental calculations all the time, to know whether you are doing what you want to do; and you will get mixed up and lost and you will become very much lost. It is not a continuous operating device...."

picture of this machine and describe its operation.

Amsler's 50-ton universal testing machine.
The specimen to be tested is shown at T, just underneath lower cross-head 1. The latter moves upward through the action of a ram and cylinder shown at 3. Rod 6 is one of two rods connecting cross-head 1 to upper cross-head 5. The cross-heads move as a result of hydraulic pressure introduced into the cylinder. The pressure is supplied by oil pump O. The force exerted is controlled and rendered uniform by a special "over pressure" valve designated Amsler Valve in the picture. The extent of the force, *i.e.*, the weight of the load being applied to the specimen, is indicated by a pendulum dynamometer shown at D, 5 being the pendulum and 4 the dial. One of the hands shown on the dial is a load indicating hand which revolves across the graduations of the dial as the load is increased. The other is a maximum hand, a loose pointer which is engaged by the load hand as it rises and which remains in the highest position reached by the load hand after the latter, upon the fracture of the specimen, returns to zero. The function of the maximum hand is to indicate the maximum load applied in a test.

It is not contended that the machines (other than the one shown in the Krause circular) which we have described solved the problem of the art. It was Blanks' apparatus which with its combined pacer and load indicating hands solved the problem by making possible an exact application of load to specimen at a predetermined rate. As indicated earlier in this opinion the Commissioner concedes this and concedes also that the Blanks apparatus is a patentable advance unless anticipated by the Krause circular. This case thus reduces itself to the one question whether or not the illustration and text of the Krause circular (which we shall assume was, as alleged, published and distributed in Austria more than two years prior to the date of Blanks' application) sufficiently disclose a machine of Blanks' type to constitute an anticipation.

 The consideration of a foreign publication relied upon as a reference against a claimed invention must be in the light of the law relating to such a publication. As was said in the leading case of Seymour v. Osborne, 1870, 11 Wall. 516, 555, 20 L.Ed. 33, an infringement proceeding, the defense or invalidity of the patent in suit because described in a foreign publication is not made out unless it is shown that "the description and drawings [of the foreign publication] contain and exhibit a substantial representation of the patented improvement, in such full, clear and exact terms as to enable any person skilled in the art or science to which it appertains, to make, construct, and practice the invention to the same practical extent as they would be enabled to do if the information was derived from a prior patent. Mere vague and general representations will not support such a defense, as the knowledge supposed to be derived from the publication must be sufficient to enable those skilled in the art to understand the nature of the invention, and to carry it into operation." It is not competent to read into a foreign publication any information which it does not afford on its face. Badische Anilin & Soda Fabrik v. Kalle, C.C.S.D.N.Y.1899, 94 F. 163, affirmed 2 Cir., 1900, 104 F. 802; Loew Filter Co. v. German American Filter Co., 6 Cir., 1908, 164 F. 855; Carson v. American Smelting & Refining Co., 9 Cir., 1925, 4 F.2d 463, certiorari denied, 1925, 269 U. S. 555, 46 S.Ct. 18, 70 L.Ed. 409. The disclosure of a foreign publication must be so clear that it teaches the subject matter of the patent in suit without assistance from the latter. Wisconsin Alumni R. Foundation v. Breon & Co., 8 Cir., 1936, 85 F.2d 166, certiorari denied, 1936, 299 U.S. 598, 57 S.Ct. 191, 81 L.Ed. 441. Moreover, as was held in Atlantic Gulf & Pacific Co. v. Wood, 5 Cir., 1923, 288 F. 148, 155, quoting from Cimiotti Unhairing Co. v. Comstock Unhairing Machine Co.,

C.C.S.D.N.Y.1902, 115 F. 524, a case itself based upon Seymour v. Osborne, "A [foreign] document so obscure in its terminology that two conflicting theories may be deduced therefrom and supported by equally plausible arguments is too indefinite to be utilized as an anticipation." These principles, although applied by the courts referred to in infringement suits, are equally applicable to proceedings to obtain a patent. Becket v. Coe, 1938, 69 App.D.C. 51, 98 F.2d 332. That is to say, a foreign publication cannot operate to anticipate a claimed invention unless it satisfies these principles.

The contention of the Commissioner that the Krause circular does disclose Blanks' device comes in sum to the following: The Krause machine is described in the circular as one for the testing of materials with finest regulation of testing speed, clear visibility of tests on a pendulum manometer, direct reading of the loading, and use of a time clock built into the pendulum scale with concentric arrangement of the hand of the clock with the hands of the scale; therefore one of the two hands on the Krause dial is a load indicating hand like that of Blanks and the other a pacer hand like that of Blanks.

The Commissioner's conclusion that the Krause circular discloses that one of the two indicating hands of the Krause dial is a load indicating hand is justified—by the statement in the circular that there is direct reading of the loading on a pendulum scale. But the conclusion that the circular shows that the other hand is a pacer hand functioning as the pacer hand of Blanks does is, we think, not justifiable if the circular be looked at—as it must—in the light of the principles of law set forth above limiting the requirements of a foreign publication. All that the circular describes, so far as concerns a hand other than a load indicating hand, is the hand of a time clock. Although a time clock hand moves at a predetermined rate of speed is not a pacer hand like that of Blanks for the reason that the predetermined rate of speed of a time clock hand is but a single rate, to wit, the rate which will carry it completely around a clock dial in one hour; the speed of a clock hand cannot be varied—except to the minor extent necessary for correction of error in time keeping. A time clock hand is therefore not operable, as Blanks' pacer hand is, i.e., at various and at variable rates of speed.

Within the four corners of the circular of Krause it cannot be determined that there is a pacer hand on the Krause scale. It is only by recourse to the application of Blanks and its description of a pacer hand and the reading of that description into the Krause circular that it can be concluded that one of the hands of Krause is a pacer hand. Moreover, even if it be assumed that the Krause circular is plausibly susceptible on its own face, without assistance from the Blanks application, of the inference that one of the two hands on the scale of Krause's machine is a pacer hand like that of Blanks, still the circular is susceptible of a conflicting inference at least equally plausible. The witness A. H. Emery, a mechanical engineer of excellent qualifications, testified at the trial—and no evidence to the contrary of his testimony was introduced—that the Krause circular shows an Amsler type machine, one of the hands of which, as stated above, is a load indicating hand but the other of which is not a pacer hand but a maximum hand. Specifically, comparing the Krause and Amsler machines as shown in the pictures set forth above, Mr. Emery testified that both were hydraulic machines of the vertical type, each having cylinders, crossheads, control valves governing the movement of the heads, and typical pendulum two hand dial indicators. He identified the cross-head marked 1 in the Amsler machine with cross-head marked 2 in Krause; cylinder marked 3 in Amsler with cylinder marked 3 in Krause; movable upper cross-head marked 5 in Amsler with cross-head 5 in Krause; rod 6, one of the two rods connecting the upper and lower cross-heads of Amsler, with rod 6, one of two similar functioning rods in Krause; the Amsler valve, designated in those words in the picture of the Amsler machine, with one of the valves (the witness could not say specifically which) shown in a circle designated 1 in Krause; the Amsler two handed dial 4 with its pendulum 5 with the two handed dial 4 in Krause. It is true that on cross-examination Mr. Emery conceded that the Krause circular did not specifically describe one of the two hands on the pendulum dial as a maximum hand. Thus he himself was obliged to go outside the Krause circular and to look at the teaching of the Amsler machine, and also to give weight, as he said, to the general practice in the testing machine industry of using a load indicating hand and a maximum hand. But his testimony identifies

the Krause machine, including its hands, with the Amsler type machine, including the Amsler type hands, at least as plausibly as does the contention of the Commissioner that the Krause machine and its hands are to be identified with Blanks' apparatus and the load indicating and pacer hands thereof.[5]

We think it obvious that the Krause leaflet does not, within the principles of law governing foreign publications, disclose the Blanks apparatus, and that the Patent Office and the trial court clearly erred in holding that it did. Therefore, in view of the Commissioner's concession that the Blanks apparatus is a patentable advance unless anticipated by the Krause circular, a patent should issue.

Reversed.

---

[5] The ambiguity in the teaching of the Krause circular is further evidenced by the following: The Krause circular says: "For measuring of a desired testing speed (in accordance with acceptance regulations of the German Railroad), a time clock is used which is built into the pendulum scale." There is nothing on the face of the circular which shows what these "acceptance regulations" are. The circular then goes on to say: "The hand of the clock is arranged concentric with the hands of the scale." The Krause dial shows two concentric hands. That being true, if the *hand* of the clock is arranged concentric with the *hands* of the scale, there must be three hands. But three hands are not shown. Only two conclusions may be validly drawn from this: one, that the dial indicator shown in the Krause exhibit is not described by the text, or the other, that the Krause apparatus is equipped somewhere with a third clock hand not carried on the face of the dial in visible relation with the two hands thereon.

If the second conclusion be accepted, then Krause cannot negative invention in Blanks' apparatus for it is of the essence of the latter that the pacer hand be carried on the front of the indicator dial in visible relation with the load indicating hand. If the first conclusion is true, then Krause can anticipate Blanks only by there being imagined a third hand of pacer type on the dial of Krause concentric with the other two—and this without any statement in the circular that the third hand was to pace the others singly or together at a rate commensurable with the rate of change at which it is desired to apply a load to a specimen. Nothing in the circular states that the "clock hand" is used to reflect a predetermined rate of load change.