**DYER v. COE, Commissioner of Patents.**

**No. 7374.**

United States Court of Appeals for the District of Columbia.

Decided Dec. 22, 1941.

Mr. Frank E. Liverance, Jr., of Grand Rapids, Mich., with whom Mr. John Boyle, Jr., of Washington, D. C., who entered an appearance, appeared on the brief, for appellant.

Messrs. Wm. Wallace Cochran, Solicitor, and H. S. Mackey, Examiner, United States Patent Office, both of Washington, D. C., for appellee.

Before STEPHENS, MILLER, and VINSON, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from a decree of the District Court of the United States for the District of Columbia dismissing, after a hearing on the merits, a bill in equity seeking, under Rev.Stat. § 4915, 35 U.S.C.A. § 63, an order authorizing the appellee Commissioner of Patents to issue to the appellant Dyer a patent on his application for letters patent, Serial No. 608,476, filed April 30, 1932. The appeal is from that portion of the decree in which the District Court held Dyer not entitled to the allowance of claims 1, 3, 4, 5, 7, 8, 9, 28, 29, 30, 34, 35, 41 and 44.[1] All of the claims relate to an apparatus for starting internal combustion engines of automotive vehicles. They were held by the trial court, accepting the views of the Commissioner, to be lacking in invention over the prior art. On this appeal the references relied upon by the Commissioner are:

| Collins | No. 1,862,006 | June 7, 1932 |
| Hasselbring | No. 1,763,702 | June 17, 1930 |
| Hasselbring | No. 1,596,876 | Aug. 24, 1926 |
| Renault (French) | No. 468,161 | Apr. 17, 1914 |
| Stevenson | No. 1,771,866 | July 29, 1930 |
| Ulam | No. 1,845,855 | Feb. 16, 1932 |

---

[1] Claims 13, 16, 17, 19, 20, 21, 25, 31, 33 and 46 had been rejected by the Commissioner only on the ground of multiplicity. At the trial below the Commissioner conceded that such ground had been avoided by the withdrawal of a number of other claims and that there was no other basis for rejecting the claims enumerated and that the decree of the court below might authorize the issuance of a patent thereon. These claims were therefore decreed to Dyer.

Dyer's application, in terms of the wiring diagram set forth below, discloses an apparatus which operates as follows: When ignition switch 98, 96 is closed and accelerator pedal head 122 is depressed, thus bringing points 88 and 86 into contact, an electric circuit is completed, through closed switch B, between battery 66 and auxiliary motor 40. The auxiliary motor, actuated by the battery, operates to rotate shaft 38 and beveled gear 36 mounted thereon. Enmeshed with gear 36 and rotating at a right angle thereto is beveled gear 34 which is threaded on worm grooved sleeve 24, which is itself splined to armature shaft 22 of starting motor 20. When, as a result of the action of auxiliary motor 40, gear 34 revolves, sleeve 24 is caused to move horizontally to the right along shaft 22, thus bringing starting pinion 28 into engagement with ring gear 30 which is attached to the flywheel of the engine to be started. At the same time the motion of sleeve 24 toward the right causes the lower end of lever 48 to move to the left thereby closing switch 54, 56. This completes an electric circuit between battery 66 and starting motor 20, and the starting motor then operates, through pinion 28 and ring gear 30, to turn the engine flywheel. As soon as the engine "catches," that is, starts to operate under its own power through the

explosions of gasoline in the cylinders, sleeve 24 moves back toward the left, on shaft 22, to its original position—this because the speed of the engine operating under its own power is greater than that of auxiliary motor 40, which thereby (according to the specification) "acts as a brake to retard the movement of the gear 34." As sleeve 24 moves back to its original position it withdraws pinion 28 from engagement with ring gear 30 of the flywheel and at the same time, by occasioning a rightward movement of the lower end of lever 48, it causes disconnection of the electric circuit of the starting motor at switch 54, 56. The circuit between battery 66 and auxiliary motor 40 is also at the same time disconnected, the auxiliary motor thereby ceasing operation, by the opening of switch B by means of suction communicated from the manifold of the engine through tube 162.[2]

The principal reliance of the Commissioner is upon the Collins patent and the two Hasselbring patents, each of which defines an apparatus for starting an internal combustion engine of an automotive vehicle. We think it necessary to discuss only these. The Collins patent discloses a variable fuel control (accelerator) pedal mechanically connected to a lever which operates a switch connection closing an electric circuit between a battery and a starting motor. When the automobile engine commences to operate under its own power, a pin, by gravity made a part of the mechanical connection between the accelerator pedal and the starting motor switch, is, by force of suction from the manifold, withdrawn. This breaks the mechanical connection mentioned, the switch opens, and the starting motor is thus rendered inoperative. The accelerator pedal is then free to be operated as a throttle without affecting the starting motor. The Hasselbring patents disclose an apparatus wherein by closing an ignition switch a solenoid (a type of "power operated means") is energized through the closing of a circuit between it and a battery. Movement of the magnetic core of the solenoid then closes a circuit between the starting motor and the battery, and at the same time causes, through a series of mechanical connections, the engagement of

gears which establish driving connection between the automobile engine and the starting motor. In the Hasselbring patents the engine starting is completely automatic upon the closing of the ignition switch. The Hasselbring patents also describe means, either by vacuum or by magnetic switches similar to those employed by the appellant, for rendering the starting motor inoperative and releasing it from engagement with the engine flywheel.

■ Claim 1, typical of the rejected Dyer claims, reads as follows:

"1. Control apparatus for internal combustion engines comprising, a current source, a starting motor adapted to be operated by current from said source means for establishing driving connection between the starting motor and the engine, power operated means other than the starting motor for operating said last named means, means for variably controlling the quantity of combustible mixture supplied to the engine and means operated by said mixture controlling means for controlling the operation of said power operated means."

Certain elements described in this claim are lacking in Collins, to wit, a starting motor adapted to be operated by a current source, means for establishing driving connection between the starting motor and the engine, and power operated means other than the starting motor for operating the last named means. But these are supplied by the Hasselbring patents. Thus claim 1 of Dyer describes an apparatus which could be produced by a combination of Collins and the Hasselbring disclosures. The Commissioner concluded, and the trial court also held, that it did not involve invention to produce this combination. After a careful examination of the claims in issue and of the references we think it cannot with reason be said that the rulings of the Commissioner and the findings and conclusions of the trial court to this effect were in clear error. Therefore they are to stand. Abbott v. Coe, 1939, 71 App.D.C. 195, 109 F. 2d 449.

■ The record discloses that Collins filed his application January 15, 1931, Dyer his April 30, 1932, and that the Collins patent issued June 7, 1932. Dyer con-

---

[2] Some of the claims define other methods of effecting a disconnection of the auxiliary motor circuit through switch B. One is through the use of a solenoid energized by a generator driven by the engine; another is through the use of both a solenoid and generator in connection with the vacuum in the manifold.

tends that the Collins patent is not a valid reference since the Collins application was thus co-pending with the Dyer application. But we think the point not well taken. In Minnesota Mining & Manufacturing Co. v. Coe, 1938, 69 App.D.C. 256, 258, 100 F.2d 429, 431, we said:

*"It is disclosure of knowledge inconsistent with a later claim of first invention which is important in determining the effect of co-pending applications.* Although the issuance of a patent or other proof of prior invention will constitute a disclosure, prior invention is not alone controlling; for disclosure may also occur in other ways, as by publication in a periodical, by a disclaimer of invention of a described process, or by an abandonment thereof. Consequently, it is immaterial—if a disclosure actually occurs—whether it results from a description in a single co-pending application, from descriptions in several such applications, or from descriptions in co-pending applications together with descriptions in previously issued patents. Prior knowledge, clearly revealed, is repugnant to the claim of first invention. . . ."* [Italics supplied]

Dyer relies upon Hazeltine Corp. v. Coe, 1936, 66 App.D.C. 341, 87 F.2d 558, as supporting the contention that the Collins patent is not available as a reference. But, as we said in Minnesota Mining & Manufacturing Co. v. Coe, supra,[3] Hazeltine Corp. v. Coe merely decided that since *"all of the co-pending references* relied upon therein failed, either singly or in combination, to disclose the claims of the later applicant, they did not prevent the issuance of a patent to him as the first inventor." We think it can be regarded as settled law that co-pending applications which, either singly, or in combination with previous patents or other co-pending applications, or both, disclose knowledge inconsistent with a claim of first invention, are available as references. Cf. Alexander Milburn Co. v. Davis-Bournonville Co., 1926, 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651.

Dyer further urges, however, that he has made an inventive advance over the prior art, even though the Collins patent be a valid reference, in this: In Dyer as soon as pedal 122 shown in the diagram set out above is depressed, it commences at once to open the fuel throttle between the carburetor and the engine cylinders, that is, starts immediately to feed gas, and continues to do this in constantly increasing quantity as further depressed; this function continues not only up to the time of contact of points 88, 86 as a result of which, as above explained, auxiliary motor 40 and starting motor 20 commence operating, but also thereafter. Thus whether the engine "catches" or not at the moment it starts turning over, more gas may be fed in. In other words, the pedal in the Dyer device performs the function of a variable fuel control at all times. This it is contended is a highly useful function in cold weather starting—in aiding the engine to "catch" by feeding an increasing amount of fuel as the pedal is depressed. But in Collins, although some gasoline, to wit the definite quantity which would be admitted to the carburetor through a flutter valve when the pedal is pressed down to the extent necessary to mechanically operate the switch connection closing the circuit between battery and starting motor, is fed into the carburetor by this depression of the pedal, no more can be introduced until the engine actually "catches" and is operating under its own power and through consequent suction in the manifold withdraws the pin breaking the mechanical connection between the accelerator pedal and the starting motor switch so that thereafter the pedal is free to be operated as a throttle without affecting control of the starting motor. More briefly, only after the engine has commenced operating under its own power in Collins and the pedal is disconnected from the starting apparatus can it be fully used to variably control the admission of fuel to the cylinders. In the Hasselbring patents the gas feed pedal is not combined with the starting device.

On the court's own motion this case was reheard on October 13, 1941, in consolidation with two other cases mentioned below, upon the question single to this case whether this feature of the Dyer apparatus is described in the rejected claims, and upon a further question, mentioned below, common to all three cases. But upon consideration of the contentions made at the reargument and in briefs submitted, we think the conclusion is compelled that, however, useful, novel and inventive this variable fuel control during starting feature of the Dyer apparatus may be, it is not described in any of the claims in issue. For example claim 1 merely

---

[3] 69 App.D.C. at page 259, 100 F.2d at page 432.

says "means for variably controlling the quantity of combustible mixture supplied to the engine and means operated by said mixture controlling means for controlling the operation of said power operated means." In order adequately to describe the specific advance upon which Dyer relies as above stated it would be necessary to add words defining means for variably supplying fuel to the engine *during engine starting*. Therefore, assuming, without ruling, that Dyer made a meritorious contribution of inventive character, the trial court could not authorize the granting of a patent thereon where that contribution is not defined in the claims as now written. The statutory requirement (Rev.Stat. § 4888, 35 U.S.C.A. § 33) that the applicant for a patent "shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention" has not been met. 2 Walker, Patents (Deller's ed., 1937) 769.

Dyer urges a further ground for the allowance of a patent upon the rejected claims. He asserts that the only difference between those claims and the ones which were allowed by the Commissioner is that the latter are limited by the recital of specific types of means such as "a foot operated accelerator pedal," "an auxiliary rotary motor" and "a generator," and that the rejected claims, in other respects similar to the allowed claims, are phrased for protection of the allowed claims against substitution of certain well-known equivalents for the specific means mentioned. Assuming that the rejected claims are substantially identical with the allowed claims, differing only as asserted by Dyer in breadth for the purpose of protecting against infringement through equivalents, still the contention that the rejected claims should be allowed in order to protect the allowed claims assumes that the action of the Commissioner in granting the allowed claims is a conclusive measure of patentability of the rejected claims. That is to say, what Dyer in effect is urging is that since the allowed claims were held patentable and the rejected claims are substantially identical therewith—differing only for the purpose of protection against infringement through equivalents—they must be granted.

At the rehearing of this case, referred to above, consolidated with No. 7400 Sharp v. Coe, —— App.D.C. ——, 125 F.2d 185 and No 7533 Minnesota Mining & Manufacturing Co. v. Coe, —— App.D.C. ——, 125 F.2d 198, the question common to the three cases, whether or not a court in passing upon the patentability of claims rejected by the Commissioner may use as a measure of patentability allowed claims was reargued and briefs presented thereon. As stated in No. 7400 Sharp v. Coe, decided this day, we rule that the action of the Commissioner on allowed claims is not to be taken as a conclusive measure of the patentability of rejected claims; that patentability of the latter must be determined ultimately by comparison with the prior art; although in connection with such other items of evidence as may be relevant the Commissioner's action on allowed claims can be taken into consideration in determining the patentability of rejected claims—the persuasive value to be given to the action of the Commissioner in respect of allowed claims to be determined in each case on its own facts.

If the rejected claims cannot in and of themselves be held patentable over the prior art, they cannot be held patentable for the purpose of protecting allowed claims against infringement through equivalents. And in this case we think that, even considering the action of the Commissioner in granting the allowed claims as one item of evidence bearing upon the question of patentability of the rejected claims, still it cannot reasonably be said that the trial court was in clear error in its ruling that the rejected claims were not patentable.

Affirmed.