33 C.C.P.A. (Patents)

## Application of FREED.

### Patent Appeal No. 5168.

Court of Customs and Patent Appeals.

June 11, 1946.

A. A. Orlinger, of Glen Olden, Pa., for appellant.

W. W. Cochran, of Washington, D. C., for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

BLAND, Associate Judge.

Owing to the number of claims and the size of the record and briefs, the issues in this case at first appear quite formidable, but upon closer approach the real issue determinative of the appeal is not an involved one.

The Primary Examiner of the United States Patent Office rejected all of appellant's claims, 1 to 18, inclusive, in an application for a patent entitled "Catalytic Compositions." Upon appeal to the Board of Appeals claim 18 was allowed and it was indicated that claims 1, 6 and 9 could be allowed over the cited prior art references if "*uniformly*" were inserted before 'dispersed'" at certain places in the claims.

From the board's decision affirming that of the examiner in rejecting claims 1 to 17, inclusive, appellant has here appealed.

In this court, appellant, "to reduce the issue and expedite consideration of the appeal," moves to withdraw the appeal as to product claims 2 and 3, and process claims 12, 13, and 15, "as if they were cancelled without prejudice." Appellant's motion to withdraw, being considered as a motion to dismiss as to the claims enumerated, will be granted. This leaves for consideration article claims 1, and 4 to 11, inclusive, and method claims 14, 16 and 17.

Of the appealed claims, claim 1 and claim 14 are regarded as representative and follow:

"1. A catalytically active composition in the form of flakes comprising a catalytically active inorganic constituent deleteriously affected by the air dispersed in a solidified oleaginous substance as a protective medium."

"14. In the method of preparing a solid catalytically active composition in . flake form with the ingredients thereof dispersed

therein in homogeneous character, comprising nickel in catalytically active state dispersed in a solidified oil of vegetal origin, the step which comprises distributing over a chilled surface a layer of a liquid suspension comprising said nickel in catalytically active state homogeneously dispersed in said oil in liquid state, to harden the composition."

We think the claimed invention is briefly but best described in the brief of the Solicitor for the Patent Office and we quote:

"The application relates to a catalyst to be used in the hydrogenation of vegetable or animal oils.

"Vegetable oils, such as cotton-seed oil, are liquid at ordinary temperatures and are suitable for use in cooking but are not considered as desirable as a white solid product having the appearance of lard. Cotton-seed oil may be converted into such a white solid product by adding hydrogen to it under heat and pressure. This is how 'Crisco' is made. In order, however, for the hydrogen to enter into combination with the oil it is necessary that a catalyst be present. This catalyst is usually finely divided nickel. But finely divided nickel, unless protected from the air, will become oxidized and useless as a catalyst. To provide this protection of the nickel it is customary in the art to disperse the nickel in an oil. [Appellant's application so states.] Appellant uses a hydrogenated vegetable or animal oil for this purpose, which oil is solid at ordinary temperatures. All this is recognized by appellant to be old. Appellant states in his specification that it is customary to put up this catalytic material for shipment by running the hot liquid dispersion of nickel into steel drums in which it cools and solidifies. An alleged disadvantage in this procedure is that the particles of nickel being heavier than the oil will settle to some extent toward the bottom of the drum before the oil solidifies with the result that the concentration of nickel at various levels in the drum will vary. As a consequence it is necessary for those who use this material to take samples from various portions of the material in the drum and analyze them to determine the actual nickel content.

"To remove this difficulty, appellant stirs the hot liquid continuously to maintain it homogeneous as to nickel content and distributes it continuously in a rather thin film over a chilled drum. The liquid is thus quickly solidified. Following this the material is scraped from the drum to form flakes. In such form the material may be conveniently shipped in bags or fiber containers.

"Two advantages residing in this product are apparent. First, the product may be shipped and used more conveniently than the solid mass contained in a 50-gallon drum. Second, the product is uniform in composition."

The examiner rejected certain of the appealed claims upon the following references: Ellis, 1,329,322, January 27, 1920, and Boertlein, 1,740,064, December 17, 1929, and in discussing the application of the references to the claims stated in part:

"Claims 1 through 6 and 9 are rejected as unpatentable over Ellis. The flaked product of these claims differs only in degree, if at all, from the 'rough fragments' of the patent. In this connection, it has been argued that the art shows only *large* fragments or *large* blocks of nickel-containing solid oils, fats, waxes, etc. However, the term *'large'* has been read into the references by the applicant. At any rate the claimed flaked product differs from *larger rough fragments* only in size and this is not considered of patentable significance. It should be noted that applicant breaks the hardened layer of material into 'fragments' without further limitation in claim 15. Furthermore the size of the flakes is not limited in the claims.

"The applicant points out the 'tremendous' advantage of the flaked product over the prior art in the feasibility of shipping it to the point of use. However, no advantage over the 'rough fragments' of the Ellis reference can be seen, since Ellis' product is not fusable at ordinary temperatures and 'can be shipped in ordinary cloth bags or slack cooperage.' In the specification and later, in the prosecution of the application, the applicant has failed to recognize this aspect of the prior art.

"The product claims, i.e., claims 1 through 6 and 9 are also rejected as unpatentable over Ellis taken in view of Boertlein. This patent discloses the flaking of soap, which is a saponified fat or oil. This ties in pretty well with Ellis in which there is a disclosure of saponifying the oil being treated to make soap thereof. Note lines 90 to 102 on page 4 of Ellis. Noting the disclosure on this same page, lines 109 to 116, it is obvious that *the* some of the colloidal nickel remains in the hydrogenated product since there is an input of 40 pounds of nickel and only 38 pounds are recovered. If this hydrogenated product containing a small amount of nickel be saponified as suggested by Ellis (converted into soap) and then flaked as suggested by Boertlein, applicant's product and process would be produced. The product (and process) also seems uninventive when viewed in this light.

"Claims 12 through 18 are rejected as unpatentable over Ellis taken in view of Boertlein. The claims merely recite the flaking steps of Boertlein applied to the catalytic mixtures of Ellis. Ellis provides a *stirrer* to insure the homogeneous character of his product which characteristic is recognized as highly desirable in the art. It is well recognized that a given quantity of material must contain a definite amount of nickel in order to enable the operator to accurately measure the desired amount of the nickel to be added to a batch of oil to be hydrogenated. Note the percentages of nickel in Ellis' product, page 3, paragraph 2, for instance. Hence, it appears obvious that no new problem is encountered and no new process steps are involved in flaking Ellis' composition by Blertlein's process. No adaptation is necessary in conveying Ellis' nickel-containing oil or paraffin wax to Boertlein's flaking apparatus, since Ellis' product is homogeneous at the end of the reduction step due to the action of his stirring apparatus." [Italics quoted.]

It will be noted that of the claims we are here considering claims 1, 4, 5, 6 and 9 were rejected as unpatentable over the patent to Ellis, and they were also rejected as unpatentable over Ellis in view of Boertlein. We will consider these claims first.

The Ellis patent is directed to a new and useful improvement in making powdered metals and reduced metallic compounds and the article so produced. He was concerned with producing a catalytic material, such as nickel which is involved in the instant case, in finely divided form for use in the hydrogenation of fatty oils. He, for the same purposes as those proposed by appellant, suggested concentrating from 20 to 25%, or, in some instances, 60 to 80%, of nickel in oil and then allowing the molten mixture to settle or be centrifuged. The concentrate is then separated from the remainder of the wax.

While Ellis' product may be put up in drums in which the oil and nickel particles would be intermixed, it is obvious a settlement of the heavier particles might result. He also states in his patent the following:

"* * * Also it has been proposed to heat organic salts of nickel in an oil vehicle to bring about the formation of finely divided nickel."

Further along he recites that:

"Further as noted, paraffin wax or similar mineral wax is well suited as a medium in which the catalyzer is formed and the use of a hard brittle wax free from oleaginous material including freedom from fatty material reactive with nickel on standing (thus changing the physical structure of the catalyzer) affords a product which can be shipped in ordinary cloth bags or slack cooperage. No expensive shipping container is required. The catalyzer may be shipped *in the form of cakes or rough fragments* which for use are simply added to the oil to be hardened or if desired may be melted in a separate container with some oil and pumped to the point of use. By employing a hard wax so that the fragments do not fuse together in shipping, the product is more readily handled for some purposes." [Italics added.]

It is true that Ellis does not state the method in which the liquid is flowed over a chilled surface to cool and solidify it, nor does he explain just how the catalyzer is reduced to the form of cakes or rough fragments, but the Boertlein patent shows how molten liquid is placed in a pan over which a rotating drum operates and the

liquid is chilled by water circulating through this drum. The liquid film carried up on the drum solidifies and is scraped off in flakes by a scraper. To aid in the cooling of the film, Boertlein provides means for blowing a current of air against it. This feature is not shown in the present application.

Boertlein is concerned with producing solid materials in the form of flakes, and he was particularly concerned, though not so limited, with flaking such materials as soap. There is nothing new or novel about flaking liquid materials which solidify upon being cooled. One of the most common expedients today in the making of numerous articles, including soap, is to reduce it to flakes. This is done with the purpose of making them more suitable for shipment and readily usable, which is the purpose for which appellant flakes his material. Boertlein states that:

"The flaked product possesses the advantages of being homogeneous in composition and, because of its physical form (being in the form of thin, flat pieces of laminae), of presenting a large surface to the action of a solvent. It is easy to handle, and can be readily packaged and removed from containers."

The board, in affirming the elaborate decision of the examiner (except as to claim 18, which it allowed), in part said:

"Applicant describes his flake product as fairly uniform in thickness, the flake production in individual batches being regularly homogeneous.

"Ellis does not show the flake form of the product but the form per se is obvious from Boertlein. Claims 1 to 6 and 9 do not state that the nickel is uniformly distributed in the flake as stated in line 26, page 5 of the specification.

"Applicant's process is described at the top of page 5 of the specification but as stated in claims 12 to 17, the process involves not much more than pouring the Ellis molten mixture into a cold barrel. The step of breaking the cold mass into fragments or flakes does not distinguish from Ellis in an inventive sense.

*     *     *     *     *

"Claims 1, 6 and 9 could be allowed over the cited art if *uniformly* were inserted before 'dispersed' in line 3, claim 1 and line 2, claim 6. [Italics quoted.]

"Applicant contends that the references do not remotely suggest applicant's concept. The same appears to be true of applicant's claims, except claim 18.

"The patents submitted with the brief for various forms of phthalic anhydride, including a patent on the flaked form, are not persuasive that we should allow the present rejected claims. Applicant's invention is not in the form but in the uniform distribution of nickel in the flaked form.

"The decision of the examiner is reversed as to claim 18 and is affirmed as to the remaining claims on appeal.

"In the absence of pertinent art claims 1, 6 and 9 are considered allowable when amended as suggested."

Upon petition for reconsideration, appellant contended that if claims 1, 6 and 9, when amended to include the word "uniformly" as before stated, and claim 18 were allowable, the board should also allow claims 12 to 17 for the same reasons as claim 18. The board undertook to distinguish these claims from claim 18 and we are not sure that they have satisfactorily done so, but in any event we are not privileged to consider the board's allowance of claims in determining whether appealed claims are patentable. The authorities are so numerous on this question as to not require citation here.

Appellant, after having fully discussed the questions involved in a petition for reconsideration before the board, has filed two elaborate briefs here and urges, among many other contentions, that his process and article differ from the disclosures of the prior art in that (1) by agitation while cooling he uniformly disperses the nickel particles throughout the solidifying oil; (2) there is no cited prior art disclosing the flaking of materials of this character or any material similar thereto which contains heavier mineral particles, such as nickel. Appellant argues that Boertlein, in flaking his material, was not confronted with the problem of flaking a material con-

taining heavy mineral particles and urges that the composition disclosed in the Boertlein patent did not contain any inorganic solids and that, contrary to the contention of the Solicitor, the soap with which Boertlein was concerned was a single, individual substance not having "any of the distinct constitutional characteristics of the composition appellant used."

Appellant urges that Boertlein's material is a "nonheterogeneous material" and "consists of a single, individual substance." The Solicitor urges that it is more than one substance, and while we think that soap is composed of more than one substance it is obvious that ordinary soap is not composed of substances of such divergent characteristics with respect to settling as is the material of appellant. However, we think this fact is immaterial because one who knew how to flake the Boertlein material would certainly know how to flake appellant's material. The importance of flaking, for all purposes stated, was generally known in the art.

So to recapitulate, we agree with the tribunals below that "agitation while cooling" in the manner described by appellant for the purpose of getting a homogeneous mass into more solid form does not amount to invention, nor is it inventive to flake a product as appellant has done.

It may be that appellant's process and procedure will expedite the handling of a catalytic material of this character, but we think everything appellant has done which is defined by the appealed claims, in view of the prior art, is within the skill of such art.

As to whether or not the addition of the word "uniformly" as applied to the homogeneous character of the distribution of the nickel in the oil lends patentability to certain claims, we are not here called upon to determine.

In view of the foregoing, we conclude that the board properly affirmed the action of the examiner in rejecting the claims here on appeal and its decision so doing is affirmed. As to claims 2, 3, 12, 13 and 15, the appeal is dismissed.

Affirmed.

GARRETT, Presiding Judge, sat during the arguments of this case, but because of illness took no part in its consideration or in the decision.