VAN BRODE MILLING CO., Inc.,
Plaintiff,

v.

COX AIR GAUGE SYSTEM, Incorporated, Defendant.

No. 1045–57.

United States District Court
S. D. California,
Central Division.

April 21, 1958.

---

Lyon & Lyon, by Reginald E. Caughey, Los Angeles, Cal., Kirschstein, Kirschstein & Ottinger, by David Kirschstein, New York City, for plaintiff.

Buchalter, Nemer, Coyle & Cooper, by Richard B. Coyle, Los Angeles, Cal., Kane, Kessler & Proujansky, by Albert Proujansky and Edward Halle, New York City, for defendant.

YANKWICH, Chief Judge.

Involved in this litigation are validity and infringement [1] of Coleman Patent No. 2,710,660 filed December 10, 1951 and issued June 14, 1955, for "a battery hold-down frame of synthetic rubber resin material". The chief objects of the invention are stated in the specifications in this manner:

> "The main object of the present invention is to provide a hold-down frame made of a material strong

1.  28 U.S.C.A. § 1338.

enough to resist deformation under tension of the bolts by means of which the hold-down frame is clamped against the battery top, and possessing sufficient resiliency effectively to prevent cracking of the battery top.

"Another object of the invention is the provision of a battery hold-down device which is made of a material that has good electrical insulating properties and is, thus, especially suited for use in connection with electrical batteries.

"A further aim of the invention is to obtain a hold-down device of the character mentioned which has a relatively high heat resistance, and which is noncorrodible, being thus able to withstand deformation by the heat of the engine, near which it is, of necessity, located, and not being subject to attack by the electrolyte of the battery.

"Still another object of the invention is to provide a battery hold-down device of a material which will not adhere to the battery, thereby permitting convenient removal thereof from the battery."

The Claims are four in number. They are printed in the margin.[2]

Plaintiff's complaint put in issue the infringement of Claim 3, and also charged unfair competition. However, the defendants, by answer and counter-claim, have challenged the validity of all the Claims and, in addition to non-infringement, have pleaded anticipation, invention by others and lack of patentability.[3]

## I

### The Unfair Competition Claim

■ Plaintiff's pendant claim of unfair competition[4] may be disposed of summarily by stating that the only alleged act of unfair competition is similarity of the frames of the defendant and of the boxes in which they are kept. The frames are of the same size, because they must fit standard batteries. They are both red. But the plaintiff has no exclusive right to *the size* of a hold-down which must fit standard batteries. Nor can he appropriate the color red for the making of a plastic hold-down frame and, —in the absence of any imitative deceptive devices which tend to mislead the

2. "What I claim is:

"1. A one-piece open battery hold-down frame formed of plastic material, comprising sides, ends connecting said sides, and diagonal clamping members being disposed above the top faces of said ends and sides, the plastic material of which said frame is formed comprising polystyrene the mechanical and physical properties of which have been modified by the addition of a Buna S with a high styrene content, the latter imparting to the polystyrene improved heat resistance, building strength and toughness sufficient to withstand pressure to which the frame is subjected in its function to hold the battery on its support, and also imparting to the polystyrene enough flexibility to prevent breakage of the battery top against which said diagonal members bear in the holding down operation.

"2. A one-piece battery hold-down frame according to claim 1, including an inorganic filler added to the modified polystyrene to increase the elasticity of the compound.

"3. A one-piece open battery hold-down frame formed of plastic material and including elements bearing against the sides and top of the battery, the plastic material of which said frame is formed comprising polystyrene the mechanical and physical properties of which have been modified by the addition of a Buna S with a high styrene content, the latter imparting to the polystyrene improved heat resistance, building strength and toughness sufficient to withstand pressure to which the frame is subjected in its function to hold the battery on its support, and also imparting to the polystyrene enough flexibility to prevent breakage of the battery top against which elements of said frame bear in the holding down operation.

"4. A one-piece battery hold-down frame according to claim 3, including an inorganic filler added to the modified polystyrene to increase the elasticity of the compound."

3. 35 U.S.C.A. § 102(a) (b) (e) and (f).

4. 28 U.S.C.A. § 1338(b).

public as to source and sponsorship of the goods,—claim unfair competition on the part of another device similarly made of plastic and colored red.[5]

No evidence has been offered as to actual confusion or tendency to confuse. The evidence in the record shows that the frames are not stacked on shelves where a customer might see them. They are boxed in cartons of the same size, depending upon the size of the batteries. As batteries are standard, the size of the devices, by whomever manufactured and the boxes in which they are kept, must of necessity, be similar. The boxes of the plaintiff emphasize a solid red background with letters and symbols in white. Those of the defendant combine yellow and red, with yellow as the background. The legends are different. So are the symbols. And, even if a customer were to pick one from the shelf, as in the case of canned goods, there would be no likelihood of confusion. As it is, they are not sold by tradename. They are sold, as testified to without contradiction, at the trial, by gas station attendants when asked by an automobile owner to replace the hold-down frame made of steel which all standard automobiles carry. In most instances, the evidence is that it is the supplier who suggests the plastic article in lieu of the equipment to be replaced and that it is priced higher than the steel replacements. Automotive retailers supply them to the gas stations.

There is nothing in the record to indicate that, in the trade, the color red on the frame, or the colors red and white on the boxes have become associated, in the minds of either prospective customers or suppliers with the plaintiff's product, or that either has acquired a secondary meaning which identifies its source and sponsorship with the plaintiff. So the case is lacking absolutely in the essentials which go to constitute unfair competition.

## II
### The Patent In Suit

The application originally sought two claims, reading:

"1. A one-piece open battery hold-down frame formed of plastic material, comprising sides, ends connecting said sides, and diagonal clamping members at the juncture of said sides and ends, said clamping members being disposed above the top faces of said ends and sides, the plastic material of which said frame is formed possessing strength and toughness sufficient to withstand pressure to which the frame is subjected in its function to hold the battery on its support but having enough flexibility to prevent breakage of the battery top against which said diagonal clamping members bear in the holding down operation.

"2. A one-piece battery hold-down frame according to claim 1, including lugs for engagement with means which force said clamping members into engagement with the battery top."

They were rejected finally by the Examiner on July 2, 1953. On appeal taken by the patentee to the Board of Appeals the action of the Examiner was approved on March 16, 1955. On April 2, 1955, the applicant filed a proposed amendment to the specifications and new claims by which he claimed the original two claims and the four claims which are now in the patent. The Examiner disallowed the original two claims but allowed the claims now in suit. These facts are very significant, because they indicate clearly that what the patentee originally sought was a monopoly for the construction of a hold-down frame of plastic.

The Examiner, in his first rejection, stated that such a claim was anticipated:

"The further fact that applicant uses a different material than either

5. See the writer's opinion in Chun King Sales, Inc., v. Oriental Foods, D.C.Cal., 1955, 136 F.Supp. 659, 662–666; Oriental Foods, Inc., v. Chun King Sales, Inc., 9 Cir., 1957, 244 F.2d 909, 915–916.

of these patentees does not produce an article meriting patentability. Moreover the use of plastic, the material adopted by applicant, in forming a holding device, is shown to be old in Leuvelink—see page 2, column 2, lines 49–54 and page 3, column 2, lines 6–8."

His final rejection included this ground. So what came out of the Patent Office was a patent for an article, *in itself not patentable*, made of a particular plastic material.

What the patentee now seeks is to monopolize the field by claiming that he taught the art the combination by interpolymerization of the two chemical elements, butadiene and styrene, to secure a plastic frame of this durability.[6]

The inventor, Coleman, is not a chemist. The patent in suit, while claiming the combination of butadiene and styrene to produce a Buna S with a "high styrene content" does not specify the proportions to be used. Nor do the specifications. The copolymer referred to as "Darex copolymer No. 3" is manufactured by Dewey & Almy Chemical Company and its formula is known. "Buna S" is a synthetic rubber-resin made by polymerization of butadiene and styrene, invented by the Germans during World War I. The use of the name has disappeared, because later chemistry has displaced the catalyst used in such synthetic materials. The term in the trade for the ordinary synthetic rubber-resin now used is GR–S (Government Rubber Styrene).

There is nothing in the patent to indicate to anyone skilled in the art what the words "high styrene content" mean.

It is a well-known rule that an inventor will be given the benefit of his invention, even though he may, himself, not understand

"the exact nature of the physical or chemical changes involved or resulting from his process, if the product and the process are novel and useful."[7]

But an inventor like Coleman who claims a monopoly for a process polymerization of two elements, butadiene and styrene, well-known in the field of chemistry, and who states under oath, as will appear more fully in the discussion to follow,— that he had in mind a styrene proportion "higher than fifty per cent" is confronted with one of several consequences. Either there is no patentability because the patent does not teach any more than what chemical knowledge teaches, i. e., the result of interpolymerizing the two elements, or his patent is invalid for insufficient disclosure.[8] Or, if his definition is accepted, there is no infringement, if another person combines the same elements in different quantities and produces a less durable product.

### III

### Patentability

The evidence in the record indicates that the plaintiff's patented article has had commercial success. However, such success does not spell patenta-

---

6. See the writer's opinion in Joyce, Inc., v. Solnit, D.C.Cal.1939, 29 F.Supp. 787; and see, Anderson v. Phoenix Products Co., 7 Cir., 1955, 226 F.2d 191, 193. A patentee cannot claim more than he invented. Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 1938, 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008.

7. Celite Corporation v. Dicalite Co., 9 Cir., 1938, 96 F.2d 242, 246; Application of La Verne, Cust & Pat.App.1956, 229 F.2d 470, 473–474.

8. 35 U.S.C.A. §§ 111, 112; Becket v. Coe, 1938, 69 App.D.C. 51, 98 F.2d 332, 336–337; General Electric Co. v. Wabash Appliance Corp., 1938, 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402. The Supreme Court has stated:
"Certainly, if we are to be consistent with Rev.Stat. § 4888 [35 U.S.C.A. §§ 111, 112, 162], a patentee cannot obtain greater coverage by failing to describe his invention than by describing it as the statute commands." Halliburton Oil Well Cementing Co. v. Walker, 1946, 329 U.S. 1, 13, 67 S.Ct. 6, 12, 91 L.Ed. 3.

bility if there be no invention.[9] And the latest decisions of the Supreme Court dealing with chemical patents teach that applying an old process to an analogous use lacks the very essence of invention.[10] As stated in a leading case:

"A product claim describes· an article, new and useful. The principle of the Ansonia case [Ansonia Brass & Copper Co. v. Electric Supply Co., 144 U.S. 11, 12 S.Ct. 601, 36 L.Ed. 327] plainly would deny validity to the Pipkin patent if the prior art disclosed an electric bulb so frosted on the inside as to round out the angular crevices produced by the first etching, whether the full utility of the bulb had been previously recognized or not. The same result is indicated where, as in the present case, the prior art discloses the method of making an article having the characteristics of the patented product, *though all the advantageous properties of the product had not been fully appreciated.*" [11] (Emphasis added.)

■ This is but an application to chemical patents of the principle that, in order for a new use to be patentable, there must be a new, different and non-analogous result not taught by the prior art and not discernible to those skilled in the art.[12] Unless the patent, especially a process patent, achieves such result, it does not constitute invention, even though it may constitute an improvement on the prior product.

The principle was stated by the Court of·Appeals of the District of Columbia in a noted case:

"There was ·no new idea involved in the claimed ˙invention in this case; nor even in a new use made of an old idea. It was no more than a carrying forward of the original idea of using an adhesive tape as a ˙mask for spray-painting, which was well known in the industry. *While the Drew composition constituted a more effective combination of familiar ingredients than those previously used, the result was not new within the meaning of patent law, and did not rise to the dignity of invention.* The use of his composition accomplished the same thing in the same way, by substantially the same means, with better results. This did not constitute such an invention as to sustain a patent.

"*The general characteristics of rubber for adhesiveness and cohesiveness, when combined with resin, fillers*—such as zinc oxide—*and solvents*, as specified in appellant's claims, *were known.* Years of experimentation had been devoted to the subject of rubber adhesives, resulting in the production of many varieties of tapes, cements and other products well known to laymen ˙ as well as to those trained in the art.

9. Celite Corporation v. Dicalite Co., supra, Note 7, 96 F.2d at page 242; Photochart v. Photo Patrol, Inc., 9 Cir., 1951, 189 F.2d 625, 628; Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 1945, 324 U.S. 320, 330, 65 S.Ct. 647, 89 L.Ed. 973.

10. Dow Chemical Co. v. Halliburton Oil Well Cementing Co., supra, Note 9, 324 U.S. at pages 327–330, 65 S.Ct. at pages 650–651; Mandel Brothers, Inc., v. Wallace, 1948, 335 U.S. 291, 296, 69 S.Ct. 73, 93 L.Ed. 12.

11. General Electric Company v. Jewel Incandescent Lamp Co., 1945, 326 U.S. 242, 248, 66 S.Ct. 81, 84, 90 L.Ed. 43.

12. Potts v. Creager, 1895, 155 U.S. 597, 607–608, 15 S.Ct. 194, 39 L.Ed. 275; Gilbert Spruance Co. v. Ellis-Foster Co., ·3 Cir., 1940, 114 F.2d 771, 773; In re Thuau, 1943, 135 F.2d 344, 30 C.C.P.A., Patents, 979; In re Prutton, 1946, 156 F.2d 87, 88–89, 33 C.C.P.A.,Patents, 1212; In re Prutton, 1946, 156 F.2d 91, ·33 C.C.P.A.,Patents, 1217; Application of Waite, 1948, 168 F.2d 104, 108, 35 ·C.C.P.A.,Patents, 1117; and see, the writer's opinion in Elrick Rim Co. v. ·Reading Tire Machinery Co., D.C.Cal., .1957, 157 F.Supp. 60, 63; Stallman v. ˙Casey Bearing Co., 9 Cir., 1957, 244 F.2d 905, 907–908; Application of .Freed, ˙1946, 156 F.2d 92, 95, 33 C.C.P.A., .Patents, 1138.

The final product, upon which a patent is claimed here, came as a result of this long and gradual process of experimentation and *differs from those of the prior art only in degree and only as to relative adhesiveness and cohesiveness.* No new element was introduced, no startling, unexpected, or radical result was produced. The change made as a result of Drew's research was a change only in *form, proportion and degree, plainly indicated by the prior art. It was an easy step rather than a difficult one.*"[13] (Emphasis added.)

In dealing with metallic alloys or chemical combinations, proportion may, at times, be a critical part of an invention, because it may produce a new and more durable product unlike others known before. So the Courts have recognized, at times, invention to consist of combining certain elements in certain definite proportions, but only when an entirely new and non-analogous result is obtained.

In a leading case on the subject, which has been followed ever since, it was stated:

"Patentable novelty may reside either in the elements of alloys or in the proportions of the elements. If novelty of elements is claimed in the first patent, that patent falls on the plaintiff's failure to controvert the defendant's evidence abundantly showing that before Churchward vanadium was used with chromium, nickel, manganese and carbon in alloy steels. If novelty of elements is claimed in the second patent, that patent falls on the showing of the first patent. Novelty of the patented alloys, if any, must therefore be found in the proportions of the elements. * * * *But novelty of proportions in the sense of the patent law involves something more than figuring out proportions differing from any that were known before. It involves new results from new proportions, developing a new metal, or, it may be, an old metal with new characteristics of structure or performance, embracing entirely new, or at least substantially enhanced, qualities of utility.*" [14]

The new codification of the patent law embodies these principles when it defines patentability as:

"* * * any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." [15]

In applying the principle, the Courts have held that mere changes of size or substitution of obvious material do not amount to patentability.[16] And our own Court of Appeals has warned us:

"But perfection of workmanship, however useful or convenient, does not constitute invention." [17]

## IV

### The Facts Proved At The Trial

Allusion has already been made to the fact that the original claims of the patent

13. Minnesota Mining & Mfg. Co. v. Coe, 1938, 69 App.D.C. 217, 99 F.2d 986, 990; and see, Old Town Ribbon & Carbon Co. .v. Columbia Ribbon & Carbon Mfg. Co., 2 Cir., 1947, 159 F.2d 379; Sherwin-Williams Co. v. Marzall, 1951, 88 U.S. App.D.C. 374, 190 F.2d 606, 607; Application of Aller, 1956, 220 F.2d 454, 456, 42 C.C.P.A.,Patents, 824.

14. Bethlehem Steel Co. v. Churchward International Steel Co., 3 Cir., 1920, 268 F. 361, 364; and see, Darwin & Milner v. Kinite Corp., 7 Cir., 1934, '72 F.2d 437, 438; Saklatwalla v. Marburg, 1949, 172 F.2d 227, 232, 36 C.C.

P.A.,Patents, 791; Oxnard Canners, Inc., v. Bradley, 9 Cir., 1952 194 F.2d 655, 659. If an element or proportions are critical, they should be disclosed in the patent. Helene Curtis Industries v. Sales Affiliates, Inc., 2 Cir., 1956, 233 F.2d 148, 159–160; Stallman v. Casey Bearing Co., 9 Cir., 1957, 244 F.2d 905, 907–908.

15. 35 U.S.C.A. § 101.

16. Application of Wolfe, Cust & Pat.App. 1957, 251 F.2d 854, 856.

17. Photochart v. Photo Patrol, 9 Cir., 1951, 189 F.2d 625, 628.

in suit were rejected because the Examiner was of the view that the use of plastic for the making of a hold-down frame for a battery did not involve invention, and that invention was not involved in selecting a particular plastic. The Examiner concluded his final rejection with these words:

"To so select one plastic rather than another, in order to secure one which is judged to be best for the particular service is an everyday practice in the field of plastics, and the mere expression in the present claims of the particular properties expected from the plastic to be used is not considered a basis for patentability."

The reference in the first rejection to Leuvelink patent is very important. The date of that application was April 22, 1944. The device was a clamping device for electrical units such as batteries and the like. In the specifications, dielectric, —i. e., non-conductive—insulating material, was recommended in order that the base or the mounted plate be insulated from the unit and the element. In recommending the material to be used, Leuvelink stated in his specifications:

"The compression element 12 is preferably formed of *insulating material, such as fiber or plastic*, to eliminate grounding of the tube to the base plate or in some instances where slight yieldability is desirable and heating effect is of negligible consequence, *the element may be formed of molded rubber or similar composition*. In the specific illustration of Figs. 1 and 2, the element 12 is preferably formed of two punched discs or plates 16 and 17 of a fiberglass phenolic composition, to withstand temperatures as high as 300° F., so that deterioration is avoided when in contact with a tube which dissipates considerable heat energy." (Emphasis added.)

Claim 8 of that patent reads:

"8. A clamping device for a detachable electron discharge tube mounted in a socket, which comprises a pair of rigid posts extending on opposite sides of said tube, *a ring member of insulating material having high dielectric properties bearing against the top of said tube,* said member having opposed apertured portions slidably fitting over said posts, and a resilient ring secured to said ring member at diametrically opposed points thereon, the free portions of said ring being flexed away from said insulating ring member and having wedging action against the inner surfaces of said posts to lock said insulating ring member against the top of said tube." (Emphasis added.)

In the original application for the patent in suit, the composition of the materials in the plaintiff's frame was not described with any definiteness. After the Board of Appeals affirmed the Examiner on the ground that the claims were "obviously broader than the disclosure" and made a new rejection on that ground under their Rule 96(b), the patentee amended his application. In one amendment he described the type of copolymer to be used, to include the following:

" 'Darex copolymer No. 3' above referred to is an elastic type of synthetic rubber resin, made by copolymerizing butadiene and styrene to produce a Buna S with a high styrene content."

This definition made its way into the specifications of the patent as granted. However, neither they nor the claims of the patent as issued disclose what is meant by "high styrene content". There is a document in the file wrapper attached to the proposed amendment dated April 7, 1955, which was also introduced at the trial,—a circular by the manufacturer of the composition, which states that the styrene content of the Darex copolymer No. 3 is *70 per cent.* Nowhere else are we told what "a high styrene" content means. The inventor in his deposition already referred to stated:

"Q. Mr. Coleman, do you know what the term high-styrene content

means in reference to a butadiene-styrene copolymer? A. I believe I do. *It means that there is lots of styrene in the majority of the material—the majority of the material contains styrene.*

"Q. When you say majority, *would your mean more than 50%?* A. *This would be what I think is so.*

"Q. In other words—A. I have nothing to substantiate. This is just my pure thinking on the thing.

"Q. In other words your pure thinking on the thing, is that right? A. Yes.

"Q. *Indicated that a high-styrene content—*A. *Means more than 50%.*

"Q. *More than 50% styrene?* A. Right." (pp. 54, 55.) (Emphasis added.)

The evidence in the record shows that for the first year after the application for the patent was made, during which some 16,000 frames were sold, the chemical combination did not work successfully: defects appeared in the coloration of the frames and there were some breakages. Ultimately, the compound originally used was abandoned in favor of two different compounds available commercially and manufactured by Dow Chemical Company and Monsanto Chemical Company, both of which have a copolymer with a styrene content as high as 80 per cent. Compounds of such high styrene content were known to the art. There is in evidence a patent to Ditz, No 2,578,518, issued December 11, 1951, the filing date of which is May 26, 1948, which is titled "A Moulding Composition for Battery Containers" which not only recommends the use of plastics for battery containers, but actually gives the proportions of two compositions which, when tested, showed the greatest durability. They are copied in the margin.[18]

Beginning in 1948, the known literature in the realm of the chemistry of rubber resins taught the use of high styrene to effect greater resistance. In the October, 1948 issue of India Rubber World, there appeared an article by H. S. Sell and R. J. McCutcheon of the Goodyear Tire & Rubber Co. in which, in summing up the advancement in the use of synthetic resin rubber blends, it was stated:

"During the course of *the past two years* the use of *high styrene copolymer resins as reinforcing and hardening agents for stocks of GR–S*, natural rubber, nitrile rubber, and neoprene has gained widespread acceptance within the rubber industry. *In this classification of high styrene copolymer resins are found resins which have styrene-diolefin ratios ranging from 70% styrene to under 95% styrene.* The general properties and uses of these resins in rubber compounds have

---

18. "*Example V.* The following composition in which the parts are by weight was prepared as described in Example I:
Polystyrene .................... 90
Copolymer of butadien–1, 3 with styrene (50:50) ............... 10
*When molded into a battery container and tested* as set forth in Examples I and II above, it exhibited the following properties:
Izod impact — 0.47 ft. lb. per inch of notch.
Bulge test — change too small for measurement.
Acid absorption (28 days at 150° F.) — 0.072%.
Resistance to the hot and cold cycle test was approximately the same as that of Example I.

*Example VI.* The following composition in which the parts are by weight was prepared as described in Example I:
Polystyrene .................... 75
Copolymer of butadiene–1, 3 with styrene (50:50) .............. 75
When subjected to the tests described in Examples I and II above, the following results were obtained:
Izod impact — 0.50 ft. lb. per inch of notch.
Bulge test — change too small for measurement.
Acid absorption (28 days at 150° F.) — 0.066%.
Results for the hot and cold cycle test were approximately the same as for Example I."

been discussed in the literature." [19] (Emphasis added.)

In Modern Plastics of December, 1948, in an article entitled "Interpretations of the Current News", an improved plastic compound known as "Styrone 637" produced by Dow Chemical Company, it is shown that by using polymer of high styrene content, plastic materials can be molded to fit a great variety of objects. It is given in the margin.[20]

In the 1950 Modern Plastics Encyclopedia and Engineer's Handbook, the use of high styrene copolymers is spoken of as an accepted method in producing "a new series of high impact plastics" for a great variety of uses. The entire paragraph is reproduced in the margin.[21]

There is an article dated 1956 entitled "Synthetic Rubber and Rubber Derivatives" by Donald S. Black, which, *without giving credit to any claimed invention,* describes butadiene-styrene copolymers of the type claimed in this invention as "the most common and widely used of synthetic rubbers". Significantly, in the description, the proportion of styrene is given as *50 per cent.* A portion of the article is given in the margin.[22]

19. H. S. Sell and R. J. McCutcheon, Impact Resistant Resin-Rubber Blends, Oct., 1948, issue of India Rubber World.

20. "The new Styron 637 designed for improved light stability has a useful life before yellowing which is several times that of previously available commercial polystyrene. It sells for 28½ cents in clear and 34½ cents in colored material, or 1½ cents a lb. over standard formulations. In general, it fabricates in the same fashion under the same conditions as other Styrons, differing only in that prolonged heating at fabricating temperatures should be avoided. Only one grade is supplied for injection, compression, and extrusion fabrication. Colors are limited to crystal and a range of translucent to opaque whites. Physical properties, with the exception of light stability, are much the same as other high quality polystyrenes.

"The manufacturer points out that light stability of Styron 637 applies to indoor use only. Outdoor weatherability calls for not only light stability, but also other chemical and physical characteristics which are not claimed for this material.

"Styron 637 is recommended as a promising material for diffusion shields, reflectors, etc., in fluorescent lighting particularly, because it will remain white without fading to yellow after a protracted period. In automotive applications, it is recommended for dials, dash panels, escutcheons, and parts likely to be exposed to sunlight inside a car. Clarity and resistance to yellowing make Styron 637 adaptable for molding which are painted on the underneath side, and the crystal compound has color permanence which makes it suitable for lens systems and other optical parts." R. L. Van Boskirk, Interpretations of Current News, in Modern Plastics, Vol. 7, Dec. 1948, p. 186.

21. "Styrene-butadiene copolymers with high styrene content are providing a new series of high impact strength plastics. This product consists of a blend of a high styrene-butadiene copolymer with any of the natural or synthetic rubbers. Compared with the copolymer alone, the resultant mixture displays excellent impact resistance, low water absorption, no change in heat distortion point, only slight differences in tensile strength and elongation, and displays good moldability and machinability characteristics.

"Blends can be compounded to customers requirements, uncompounded master batches of resin and rubber can be obtained, or the resin alone is available to be mixed and compounded by the consumer. Some of the applications for this product include textile spools, chemical buckets, photographic trays, chemical piping, and other uses where hard rubber was formerly employed. In addition to the combination of the copolymers and rubbers, formulations have been developed utilizing various grades of cyclized rubber resin." Styrene Polymers and Copolymers, Modern Plastics Encyclopedia and Engineer's Handbook, 1950, p. 754.

22. "The most common and widely used of the synthetic rubbers today is the copolymer of butadiene and styrene-GR-S (Government Rubber-Styrene).

"Butadiene and styrene are reacted in a range of ratios between virtually 100% butadiene to 50% butadiene/50% styrene. With products containing higher levels of styrene the polymer takes the

The evidence in the record shows that the defendant uses a product purchased from Bakelite, which has the tradename of TMD 2155 and is a mixture of (a) butadiene and (b) polystyrene. As already appears, the inventor is not a chemist. He does not claim discovering something which the chemists did not know. The combination of the two elements under discussion to form a resistant resin compound was known and taught in the art for a long time prior to the date of the conception of the invention in suit. So the upshot of the matter is this:

Coleman did not teach how to combine the two elements in order to develop a material that would have durability when used as a frame. That had been taught in the art long before him. At least the patent to Ditz taught it as far back as 1944.

■■ A patent is evidence of invention at the date of the application as to all matters disclosed.[23] But, for the purpose of determining invention, the date in prior or copending applications showing prior conception in time may be resorted to in order to determine whether the disclosure in them was prior art.[24]

By 1948, the composition and qualities of various Bunas was a matter of common chemical knowledge. So much so that the 1948 edition of Chambers' Technical Dictionary gives these definitions of the various Bunas:

"buna (Plastics). Synthetic rubber manufactured (at first in Germany) by polymerization of butadiene with sodium (hence the name Bu + Na). Buna-N (Perbunan) made from interpolymerization of butadiene with vinyl chloride, has good aging and off-resisting properties; Buna-S, made from butadiene and styrene, has good mechanical, electrical and aging properties; especially used for tyres." (p. 120.)

## Summary and Conclusion

■ Coleman was not the first to teach the art to use plastics in the manufacture of battery hold-down frames. His claim to that effect was rejected as not involving invention. Hold-down frames for batteries were long known in the art and have been used in automobiles ever since they began using batteries and means and frames of metal to hold them down have been a part of the equipment of every automobile. Any claim to the frame itself was rejected by the Examiner on the patent to Mabey No. 1,677,789, dating back to July 17, 1928, on an application filed August 6, 1927 and Heitshu, No. 2,360,056, dating back to October 10, 1944, on an application filed

---

form of a resin rather than an elastomer. This allows a wide range of finished products with varied physical characteristics. The physical characteristics can be varied still further by the type of reaction, activator or catalyst, emulsifiers, modifiers, and reaction terminators or short-stopping agents. In addition, the degree to which the monomers are reacted to form the copolymer, i. e., % conversion, definitely affects the finished product.

"During World War II, all of the GR-S produced was manufactured by what is now termed as 'hot' polymerization. The term 'hot' refers to the fact that it was necessary to activate the polymerization at elevated temperatures (approximately 122° F.).

"The monomers (Butadiene and Styrene) are very carefully controlled for purity, because any impurities such as,

peroxides, sulfides, etc., will adversely affect the reaction time and the finished product. The purity of the butadiene must be at least 98% and the styrene 99 percent." Modern Plastics Encyclopedia (1956) p. 157.

23. Alexander Milburn Co. v. Davis-Bournonville Co., 1926, 270 U.S. 390, 401, 46 S.Ct. 324, 70 L.Ed. 651.

24. Alexander Milburn Co. v. Davis-Bournonville Co., supra, Note 23; Yale Hook & Eye Co. v. Interwoven Hook & Eye Co., D.C.N.Y.1929, 33 F.2d 295, 297; Stelos Co., Inc., v. Hosiery Motor-Mend Corp., 2 Cir., 1934, 72 F.2d 405, 406; Dyer v. Coe, 1941, 75 U.S.App.D.C. 125, 125 F.2d 192, 195–196; Helene Curtis Industries, Inc., v. Sales Affiliates, Inc., 2 Cir., 1956, 233 F.2d 148, 158.

December 5, 1941. So the claims are, *at most,* claims for a hold-down frame made of a particular plastic material. When reduced to this, it is quite evident that the defendant's device does not infringe because the copolymer they use has *a low and not a high content of styrene.* So, if the claims in suit be limited in this respect, there is no infringement.

However, in the light of the discussion which precedes, I am also of the view that the patent is invalid, and that the Examiner was right when in his final rejection he stated that invention does not lie in recommending either the use of plastic or of one plastic rather than another as a material for a battery frame.

The issued claims limit the invention to a hold-down frame composed of a plastic of a certain composition. What stands in the way of their validity is that their teaching was known to the art and in constructing plastics. And Coleman, in recommending the making of a hold-down frame of a special composition, achieved no invention. The use for

which he recommends the composition was not new or non-analogous. With the development of plastics, spurred on by the scarcity of rubber after World War II, the use of plastics of high resistance was to be expected. The record shows that plastics were being used more and more in making certain automobile accessories. And it was inevitable that those connected with the plastic and the automotive industries would think of using them in a hold-down frame for a battery, because it was dielectric, corrosion resistant and more durable than the metal used by automobile manufacturers.

More, the claims are invalid for indefiniteness because they do not teach the proportions in which the materials are to be used. One skilled in the art could not find in them, without conducting experimentation, the exact proportions to be used in order to achieve durability.[25] Again, if invention lies in the use of a polymer of high styrene content, Coleman did not teach that to the art. It was old in the art and he cannot claim what he did not invent.[26]

25. The words of the Supreme Court in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, apply here:
"The conjunction or concert of known elements must contribute something; only when the whole in *some way* exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics. *This case is wanting in any unusual or surprising consequences from the unification of the elements here concerned,* and there is nothing to indicate that the lower courts scrutinized the claims in the light of this rather severe test." 340 U.S. at page 152, 71 S.Ct. at page 130. (Emphasis added.) Here the proportions were not critical. *If they were,* they were *not disclosed.* See, Sears, Roebuck & Co. v. Minnesota Mining & Mfg. Co., 4 Cir., 1957, 243 F.

2d 136, 141–142. And see, cases cited in Notes 8 and 14, supra.

26. The Supreme Court has stated:
"Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirements as to claims of invention or discovery. The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others, and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.' The claims 'measure the invention.' Patentees may reasonably anticipate that claimed inventions, improvements, and discoveries, turning on points so refined as the granular structure of products, require precise descriptions of

448

It follows that judgment should be for the defendant, that the plaintiff take nothing by its complaint and that the defendant have judgment on its counterclaim as follows:

1. The patent in suit is, and all its claims are, invalid for the following reasons:

(a) Insufficiency of disclosure, because the specifications do not contain "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same", do not "set forth the best mode contemplated by the inventor of carrying out his invention," [27] and do not "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." [28]

(b) The patent does not amount to invention over the prior art.[29]

2. The defendant's device does not infringe any of the claims of the patent in suit because

(a) The claims are invalid;

(b) The defendant's device is not made in accordance with the teachings of the patent in suit, because the copolymer used in the plastic for the construction of the defendant's hold-down frame has a low and not a high styrene content.

Costs to the defendant. No attorneys' fees. Findings and judgment to be prepared by counsel for the defendant under local Rule 7 West's Ann.Cal.Code, in accordance with the views expressed in this opinion.

---

the new characteristic for which protection is sought. In a limited field the variant must be clearly defined." General Electric Co. v. Wabash Appliance Corp., 1938, 304 U.S. 364, 369, 58 S.Ct. 899, 901, 82 L.Ed. 1402.